IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 5, 2006 Session

## STATE OF TENNESSEE v. LEONARD J. YOUNG

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 00-04017, 00-04018, 00-04019**
**Joseph B. Dailey, Presiding Judge; Jon Kerry Blackwood, Special Judge**

---

**No. W2002-03012-SC-DDT-DD - Filed on June 30, 2006**

---

Defendant, Leonard J. Young, was convicted by a jury of first degree premeditated murder, especially aggravated kidnapping, and theft over $1,000 but less than $10,000. See Tenn. Code Ann. §§ 39-13-202(a)(1) (Supp. 1999), 39-13-305(a)(1) (1997), 39-14-103 (1997). The jury subsequently sentenced Defendant to death for the murder, applying three aggravating circumstances: (a) Defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (b) the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of Defendant or another; and (c) the murder was knowingly committed, solicited, directed, or aided by Defendant, while Defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, theft. See id. § 39-13-204(i)(2), (6), (7) (Supp. 1999). The trial court sentenced Defendant as a career offender to sixty years for the especially aggravated kidnapping conviction and as a career offender to twelve years for the theft conviction. The trial court ordered all sentences to be served consecutively. The Court of Criminal Appeals affirmed the convictions and the death sentence.

After the case was docketed in this Court, we entered an order identifying several issues for oral argument.[1] We now hold as follows: (1) the evidence was sufficient to establish venue in Shelby County; (2) the death in the immediate family of the original trial judge constituted an "other disability" under Tennessee Rule of Criminal Procedure 25(a) such that appointment of a substitute judge was proper; (3) the trial court committed harmless error in allowing into evidence several photographs of the victim as a child; (4) the evidence is sufficient to support Defendant's conviction of first degree premeditated murder; (5) the trial court committed harmless error in admitting certain victim impact evidence; (6) the trial court committed harmless error in instructing the jury that Defendant's 1999 Mississippi conviction of kidnapping was an offense, the statutory elements of

---

[1] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

which involve the use of violence to the person; and (7) the death sentence is valid under this Court's mandatory review pursuant to Tennessee Code Annotated section 39-13-206(c)(1) (2003). We agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues and attach as an appendix to this opinion the relevant portions of that court's decision. The judgment of the Court of Criminal Appeals is affirmed.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the
Court of Criminal Appeals Affirmed**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON, and JANICE M. HOLDER, JJ., joined. ADOLPHO A. BIRCH, JR., J., filed a concurring and dissenting opinion.

Tony N. Brayton and Garland Ergüden (on appeal) and William Johnson and Dianne Thackery (at trial), Shelby County Public Defender's Office, for the appellant, Leonard J. Young.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory, Assistant Attorney General; William L. Gibbons, District Attorney General; Amy Weirich and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**INTRODUCTION**

To assist the reader in placing into context the following summary of the State's proof in this case, we offer this brief introduction which includes facts that were not adduced until the penalty phase of Defendant's trial. In mid-November 1999 in Mississippi, Defendant kidnapped one man and then killed another. Defendant was attempting to evade his apprehension for these crimes when he appeared at Jessie Cochran's farm in Hardeman County, Tennessee.

**FACTS ADDUCED DURING GUILT PHASE**

Jessie Cochran testified that she met Defendant in 1990 and dated him intermittently through 1993. On November 16, 1999, Ms. Cochran returned home to find Defendant in her house, uninvited. Defendant had a sawed-off shotgun but did not threaten her with it. They spoke for about forty-five minutes. Defendant then left, requesting, "Please do not call the law." After Defendant left, Ms. Cochran began checking to see if Defendant had taken anything. As she looked out one of her windows, she saw her Mercedes-Benz car being driven down the driveway. She reported the theft, and her car was subsequently located about twenty-three miles away in Ashland, Mississippi. Ms. Cochran explained that her farm was located about one and one-half miles from the Mississippi border "if you went straight through the woods." After Defendant's appearance, Ms. Cochran left her home and stayed with a relative until December 11, 1999.

After abandoning Ms. Cochran's car, Defendant found a Bronco kept in a locked storage building on a farm in Benton County, Mississippi, just south of Ashland, Mississippi. The keys were still in the Bronco, as well as several guns. Defendant took the Bronco and drove to Memphis. The Bronco's owner, Mr. Richard Rice, identified a photograph of the Bronco at trial.

Virginia Davis, Defendant's niece, testified that Defendant came by her residence in Midtown Memphis on a Thursday evening in November 1999. Defendant was driving a Bronco. Ms. Davis identified the Bronco as the same one pictured in the photograph identified previously by Mr. Rice. Ms. Davis stated that Defendant visited with her for about forty-five minutes. He asked her if she had a car; she did not. He also asked if her father still lived in Texas, to which she replied in the affirmative. Defendant told Ms. Davis he was going to Texas to visit her father. Defendant left at about 5:00 p.m.

Two days later, on a Saturday, Defendant returned to Ms. Davis' residence in Midtown Memphis, still driving the Bronco. He parked the Bronco nearby and walked to her house. She did not admit him because, in the meantime, police officers had visited her. During their visit, she learned some things about Defendant that she was not "happy with." However, she advised Defendant that "the law been there looking for [him]." Pursuant to the officers' instructions, Ms. Davis contacted them about Defendant's second visit.

Kathryn Crane testified that, in November 1999, she was employed by Seessel's, a supermarket located in Midtown Memphis. She was the store's bookkeeper. Ms. Crane identified a cash register receipt generated by the store dated November 20, 1999, at 5:27 p.m. Ms. Crane also identified a debit card receipt for the purchase reflected by the cash register receipt.

Michelle Naef testified that she was a graduate student at the University of Memphis in the fall of 1999, studying for a master's degree in philosophy. She and the victim, Ms. Hillary Johnson, were teaching assistants for the same professor and became friends. That fall, the victim lived "on McLean and Linden." Ms. Naef and the victim had planned to spend time together on Sunday, November 21, 1999. The victim had agreed to call Ms. Naef that Sunday morning to confirm their plans.

Ms. Naef last spoke with the victim on the morning of Saturday, November 20, 1999. When Ms. Johnson did not call the next morning as had been arranged, Ms. Naef called the victim at about 11:00 a.m. but did not receive an answer. Ms. Naef left a message. Not hearing back, Ms. Naef called again in the early afternoon and left another message. With still no return call, Ms. Naef called a third time. This time, the victim's answering machine was full and not taking additional messages. At this point, Ms. Naef became "scared." Ms. Naef and "all of the graduate students" spent the next several days searching for Ms. Johnson in person, over the phone, and by posting signs.

On Sunday, November 21, 1999, Officer Jeffrey Herbison of the Memphis Police Department found the Bronco parked near Ms. Davis' residence. He waited for someone to return to the vehicle,

but no one did. After some hours, the police department towed it away. Officer Herbison identified on an aerial photograph the locations of Seessel's, Ms. Davis' apartment, the place where the Bronco was found abandoned, and the victim's residence. Officer Herbison testified that all of these places were located in Memphis, Shelby County, Tennessee.

Nancy McPike testified that her daughter, the victim Hillary Johnson, moved from Chicago to Memphis in August 1999 to attend graduate school at the University of Memphis. After arriving in Memphis, Ms. Johnson purchased a white Hyundai automobile for $1,350. On Friday, November 19, 1999, Ms. McPike spoke with her daughter over the phone. Ms. McPike called Ms. Johnson on Sunday, November 21, 1999, but did not receive an answer. She called again late Sunday night, but again received no answer. After speaking with several of her daughter's friends, Ms. McPike contacted the police. Ms. McPike identified a jacket shown to her at trial as belonging to her daughter.

During the late afternoon of Saturday, November 20, 1999, Defendant carjacked Hillary Johnson as she was sitting alone in her car at a stop sign in Midtown Memphis, Shelby County, Tennessee. Defendant forced Ms. Johnson into the passenger seat of her car, and he began driving. Defendant drove Ms. Johnson to a remote location in Fayette County, Tennessee. There, he stabbed her once in the back with such force that the knife blade remained embedded in her body, the handle detached. Defendant dragged Ms. Johnson about twenty yards and concealed her under a sheet of tin near an old agricultural fuel tank. Defendant left Ms. Johnson to die of the knife wound. He left the site of the killing in Ms. Johnson's car and drove out of state, still trying to avoid his apprehension.

Defendant returned to southwest Tennessee several days later. He hid Ms. Johnson's car behind an old abandoned house and walked to Jessie Cochran's residence. Defendant entered her house when he found it unoccupied.

Lieutenant Rick Marlar of the Mississippi Highway Patrol testified that, on November 29, 1999, he overheard a broadcast that Ms. Johnson's car had been found hidden behind an old house in Tippah County, Mississippi. He reported to the scene; he described the area at trial as "very rural." Because he was already involved in the search for Defendant, he and accompanying officers proceeded to Ms. Cochran's house, which was only a short distance away. As Lt. Marlar looked through a window, he saw Defendant sitting inside the house, watching television with a 9 mm. gun laying nearby. Speaking through the window, Lt. Marlar ordered Defendant to "freeze." Defendant made a move toward his gun, causing Lt. Marlar to threaten to "kill him." Defendant then raised his hands. Officers broke through the door and took Defendant into custody. On Defendant's person were discovered a .22 pistol and a knife. Lt. Marlar advised Defendant of his Miranda rights immediately after arresting him.

Lieutenant David Shaw of the Mississippi Highway Patrol arrived and questioned Defendant, again advising him of his Miranda rights. Defendant executed a written waiver of his rights and stated he would answer Lt. Shaw's questions. Lt. Shaw described Defendant's demeanor as "calm

and cooperative." Lt. Shaw took an audio recording of his interview of Defendant, which was subsequently transcribed. The audio recording was played for the jury, and the jury was further provided with copies of the transcript.

During this November 29 statement, Defendant admitted to taking Ms. Cochran's car. When the police then "got after" him, he "hit the woods" and "jumped out." He remained in the woods two or three days when he found the storage building in which the Bronco was located. He took the Bronco and drove to Memphis, where he visited his niece, Virginia. He then drove to Texas, looking for Virginia's father. Unsuccessful in his search, Defendant returned to Memphis. He parked the Bronco near his niece's residence and walked to her apartment. She told him that "the law been there looking for [him]." He then "[t]ook off running." He saw a "girl at a stop sign" in a white car. He "jumped in the car" on the passenger's side and made the driver pull over. He "grabbed her around the neck" and made her switch places with him. He then drove them out Highway 64. Defendant stated that he dropped the woman off on Highway 64 after taking some credit cards from her. He then drove the woman's car into Alabama and on into Florida. After several days, he returned to Ms. Cochran's residence. He left the white car "off a gravel road behind an old house" and walked from there to Ms. Cochran's house.

Defendant denied that the driver of the white car had been with him at the old house where he left the car. He stated that he had two pistols with him when he jumped in the white car, but did not pull either on the driver. He explained that the guns had been in his boots. He stated that, when he got in the car, "[s]he asked me don't hurt her. I said I ain't gone [sic] hurt you lady, all I want to do is git [sic] away. Not gone [sic] hurt you." Defendant insisted that he then put the driver out on the highway and that when he left, "that girl was standing right there in that gravel road. I didn't harm that girl." Defendant acknowledged having obtained the 9 mm. pistol from the Bronco.

Lieutenant Gerald Blum with the Memphis Police Department testified that he had been assigned to investigate the victim's disappearance. He initially questioned Defendant on November 30, 1999. During that interview, Defendant told Lt. Blum that "he was at an address in Midtown on the street, and he approached a white car." Defendant told Lt. Blum that he got in the car and forced the female driver to drive around the city until they traveled down Highway 64, at which time he released the driver and kept the car. When Lt. Blum asked Defendant what he should tell the victim's family, Defendant said, "Tell them I'm not the one that hurt her." Defendant then paused and added, "Well, if she's hurt."

Also reporting to the scene where Ms. Johnson's car was found was Federal Bureau of Investigation Special Agent C. M. Sturgis, who began investigating the victim's disappearance when it developed into "more than a missing person" case. Agent Sturgis testified that no blood was found in Ms. Johnson's car. In the abandoned house behind which the victim's car was found, officers found a woman's jacket, which was subsequently identified by Ms. McPike as belonging to the victim. Found a short distance away from the house was a plastic shopping bag bearing the Seessel's supermarket logo.

Frustrated at not having discovered Ms. Johnson's whereabouts by early December, Agent Sturgis traveled on December 3, 1999, to the jail in Oxford, Mississippi, where Defendant was in custody. Accompanying him was Special Agent Joseph Rinehart. The two agents spent several hours with Defendant, sitting together in the common area of the jail and watching television. Agent Sturgis testified that the three of them "talked about everything under the sun" and watched a football game. At one point, Agent Sturgis showed Defendant several photographs of Ms. Johnson as a child and in family settings. Agent Sturgis explained that it would be a good thing if the family could resolve her whereabouts before Christmas. Some time after this, Defendant tapped Agent Sturgis on the chest and told him he was going to give him something. Defendant took the envelope in which the photographs had been kept and drew a map on it. Defendant described an area to Agent Sturgis and told him that, next to an agricultural fuel tank in this area, "under two pieces of tin, you will find what you're looking for."

Agents Sturgis and Rinehart spent the next couple of hours attempting to communicate by telephone to other law enforcement officers the location of the area described to them by Defendant. Because of the difficulty in describing the exact location, the field officers were unsuccessful in finding the spot described by Defendant. Defendant offered several times to take Agents Sturgis and Rinehart to the location if they would put him in a car. Eventually, Defendant was allowed to leave the jail in Sheriff Buddy East's[2] car. Taking directions from Defendant, Sheriff East, accompanied by Agent Rinehart, traveled to a remote and rural location in Fayette County, Tennessee. Agent Sturgis and Lt. Shaw followed in a second car. Upon arriving at the location described by Defendant, and after following Defendant's directions, the men found Ms. Johnson's body under two pieces of tin next to an old agricultural fuel tank. At this point, Agent Sturgis testified, Defendant "started crying." Defendant was then returned to the Oxford, Mississippi, jail by Sheriff East.

Lt. Gerald Blum with the Memphis Police Department took a statement from Defendant on December 4, 1999. This statement was tape recorded and subsequently transcribed. The audio tape was played for the jury and copies of the transcript provided to it. In this statement, Defendant admitted that he was responsible for Ms. Johnson's death. He stated that Ms. Johnson had "come out behind the [car] seat" with a knife and that he "grabbed her arm and took it away from her." This occurred "[w]hen [they] got out the car up there in the woods." He stated that they "fought" and that he had to use force to disarm Ms. Johnson. Defendant denied having been hurt during the fight but acknowledged that Ms. Johnson "got cut." He did not, however, remember stabbing her. After their fight, he "put her under some tin" after dragging her twenty yards. Defendant stated that the victim was "tryin' to move" as he dragged her, but he did not know if she was dead or alive after he placed her under the tin. Defendant stated that he decided to reveal the victim's whereabouts because he "wanted her to be with her family for Christmas and get this over with. It was eating [him] up. It was eating [him] alive."

---

[2]Sheriff Buddy East is the Sheriff of Lafayette County, Mississippi.

Dr. O. C. Smith testified that he performed an autopsy on the victim. X-rays indicated a "retained knife blade present in her left chest cavity."[3] The knife had entered the victim's upper left back and penetrated the victim's lung and aorta. The knife wound caused the victim's death within "[a] matter of minutes." Dr. Smith also testified that the victim had bruises along the line of her left jaw, near her right eye, on the right side of her neck, and on the back of her right thigh. The injuries causing these bruises preceded the victim's death by an hour or two.

Defendant presented no proof at the guilt phase of his trial.

Upon the conclusion of proof, the jury convicted Defendant of theft under $10,000, especially aggravated kidnapping, and first degree premeditated murder.

### FACTS ADDUCED DURING PENALTY PHASE

Prior to the State adducing any testimony during the penalty phase of Defendant's trial, the trial court heard the proposed testimony of Dr. Ronald Sundstrom and Ms. McPike in a jury-out hearing. Dr. Sundstrom is a professor of philosophy at the University of Memphis and employed the victim as his teaching assistant. Dr. Sundstrom described the effect of the victim's murder on himself, his undergraduate students, his graduate students, and the philosophy department as a whole. Ms. McPike is the victim's mother. She described the effect of the victim's murder on her family and the victim's friends. The trial court found that this proposed testimony was "basically related to the emotional and psychological impact that it's had on the family and friends and colleagues" and ruled that the probative value of this evidence outweighed its prejudicial effect. Accordingly, the trial court determined this testimony was admissible.

Thereafter, with the jury returned to the courtroom, Dr. Sundstrom testified that the victim had been his teaching assistant while a graduate student at the school. She began working for him in August 1999. As one of his teaching assistants, the victim mentored sixty of his one hundred eighty students, grading their papers, teaching some discussion sessions, and counseling them about their coursework. Prior to her death, the victim had met with these students six times. Dr. Sundstrom testified about the impact of the victim's disappearance and death on the philosophy department:

> Well, the impact was tremendous. It's hard to quantify. The psychological impactS the every-day-life impact was tremendous on [the students she mentored, her associate graduate students, and the faculty]. The undergraduates whom she taught w[ere] very afraid that, you know, the course wasn't going to go on. They were traumatizedSsomeone they knew intimately was murdered in this way.

> . . . .

---

[3]The handle to the knife was apparently never found.

Many of them couldn't finishSmany of them could not go on. Many of them could not complete their papers. It was very difficult for the undergraduates. I had a number of undergraduates approach me, and you know, who was caring for the undergraduates? There were so many of them to care for. Some would approach me in tears about this. It was very difficult for them, and unfortunately I didn't have the ability to care for them. There were too many of them.

The same with these graduate students.

. . . .

[T]he whole department ground to a halt. The students did not turn in their papers. Teachers did not teach. Life just didn't go on as we watched the news and as we waited for her to come back.

. . . .

Numbers of the other faculty, including myself, could not teach. We just couldn't teach, you know, under those circumstances. Our lives were devastated. Everything, again, ground to a halt. There was little to no activity around, you know, this education that we're supposed to be providing to everybody.

The graduate students themselves were severely affected because, you know, this was their program. They hoped to beSto get master degrees or Ph.D.'s in philosophy, and many of them just couldn't finish classesScouldn't turn in papers.

Dr. Sundstrom testified that he believed one of the graduate students left "because of this." Other graduate students were unable to complete their coursework and received "incompletes." Some of the graduate students were not able to complete these courses later, resulting in the "incomplete" grades becoming "F's." Dr. Sundstrom testified that, for these students, "their future is very much in question as professors of philosophy." Dr. Sundstrom continued: "the structure of an academic department was brought to a complete standstill, and we just huddled together and cried. That was it. That's all we could do."

Nancy McPike, the victim's mother, testified that the victim's death "never, ever leaves" her family. She testified about the difficulties the victim's younger brother had doing his schoolwork in sixth and seventh grades. She testified about her husband's inability to start new projects. Ms. McPike herself had been unable to complete her graduate school coursework. Ms. McPike's mother, the victim's grandmother, "cries" and "doesn't understand."

Ms. McPike explained that the victim's best friend had had an argument with the victim just before the kidnapping. Ms. McPike testified that "[t]hey can never make up" and that the friend has

"been in therapy ever since. She had herself admitted to a hospital because she was afraid she would take her own life because of this." Ms. McPike continued:

> You know, I told you everyone loved Hillary. Everyone just loved her right away. She has a whole army of friends out here who came to witness this. She has friends all over the world who will never have her again. She was such a great friend, and it makes you sick to your stomach. Sometimes when I think that she's dead, I just can't breathe anymore. When I saw her pictureSthis beautiful picture, I could hardly breathe.
>
> . . . .
>
> It's devastating. It's devastating. I don't know what it means for her to be dead and for me to be alive. I just don't know what it means.

Joe Warren, an employee in the Criminal Court Clerk's Office in Shelby County, Tennessee, testified that Defendant was convicted in Shelby County in 1974 of three counts of robbery with a deadly weapon and one count of rape.

Mary Alice Busby, the Circuit Court Clerk in Lafayette County, Mississippi, testified that Defendant was convicted in 2001 in Mississippi of kidnapping and manslaughter. Concerning this kidnapping conviction, James Allen Nault of Oxford, Mississippi, testified that, on November 15, 1999, he saw Defendant trying to kidnap his wife. Mr. Nault approached Defendant, at which time Defendant pointed a shotgun at him. Mr. Nault told Defendant to take him instead of his wife, and Defendant agreed. They got into Mr. Nault's car with Mr. Nault driving and Defendant keeping the gun pointed at Mr. Nault. While they drove, Defendant threatened to kill several people that Mr. Nault knew. At Defendant's direction, Mr. Nault drove them down a gravel road. Defendant got out and walked off into the woods.

Concerning the Mississippi manslaughter conviction, Sheriff Buddy East testified that he began looking for Defendant after hearing of Mr. Nault's kidnapping. He sent investigators to the residence of Mr. William Bramlett, one of the persons Defendant had threatened while talking to Mr. Nault. These law enforcement persons located Mr. Bramlett and warned him about Defendant. They continued looking for Defendant but were unable to locate him. The next morning, November 16, 1999, Mr. Bramlett was reported missing. Mr. Bramlett's vehicle was not at his residence. Sheriff East put out an alert for Mr. Bramlett and his pick-up truck. Officers walked through Mr. Bramlett's residence but did not find him. The next day, a family member found Mr. Bramlett's body in his home, hidden under a mattress. Mr. Bramlett had been shot with a .22 caliber pistol. Law enforcement then released information through the media in an effort to apprehend Defendant. The information indicated that Defendant was wanted for capital murder. Sheriff East testified that Mr. Bramlett's truck was eventually found two or three miles from Jessie Cochran's house.

As its final piece of evidence during the penalty phase of Defendant's trial, the State submitted certified records from Alabama reflecting Defendant's 1982 conviction of robbery in the first degree.

Defendant put on no proof.

Upon conclusion of the proof, the jury found the existence of three aggravating circumstances: (a) Defendant was previously convicted of one or more felonies, other than the present charge, the statutory elements of which involve the use of violence to the person; (b) the offense was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of Defendant or another; and (c) the murder was knowingly committed, solicited, directed, or aided by Defendant while Defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, theft. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7). The jury further determined that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. Accordingly, the jury sentenced Defendant to death for his first degree premeditated murder of Hillary Johnson. This appeal followed.

## ANALYSIS

## I. VENUE

Defendant contends that the State failed to establish that Shelby County was the correct venue in which to try him for his first degree premeditated murder of Ms. Johnson, arguing that the proof established that Defendant murdered the victim in Fayette County where her body was found. We disagree.

Our Constitution provides that an accused must be tried in the county in which the crime was committed. Tenn. Const. art. I, § 9; see also Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed."). "Proof of venue is necessary to establish the jurisdiction of the court, but it is not an element of any offense and need only be proved by a preponderance of the evidence." State v. Hutcherson, 790 S.W.2d 532, 535 (Tenn. 1990); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."). Venue is a question for the jury, State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984), and may be proven by circumstantial evidence. State v. Bennett, 549 S.W.2d 949, 950 (Tenn. 1977). In determining venue, the jury is entitled to draw reasonable inferences from the evidence. State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984). Importantly, where different elements of the same offense are committed in different counties, "the offense may be prosecuted in either county." Tenn. R. Crim. P. 18(b).

First degree premeditated murder is defined as the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the

-10-

exercise of reflection and judgment." Id. at (d). Specifically, "'[p]remeditation' means that the intent to kill must have been formed prior to the act itself." Id. The State argues that Defendant formed his intent to kill the victim while in Shelby County, thereby conferring venue in Shelby County. See Cagle v. State, 507 S.W.2d 121, 130-31 (Tenn. Crim. App. 1973) (holding that, although victim's body was found in Jefferson County, "the jury was fully justified in finding . . . that the malicious and deliberate design to kill the deceasedSthe evil premeditationStook form in the defendant's mind in Hamblen County" where defendant was tried). We agree.

Defendant told police officers in his December 4th statement that he was in Memphis "runnin' from the law out of Mississippi." While visiting his niece in Memphis, he learned that "the law was looking" for him there. He left his niece's Midtown apartment on foot, abandoning the stolen Bronco in which he had arrived. As he started across a street, "this girl pulled up and asked [him] a question and when she did, [he] jumped in the car with her." Defendant told police in his November 29th statement that he jumped in the passenger side of the car and then made the victim "pull over, pull across the street, down another street and made her switch places with [him]." Defendant explained that he forced the victim to change places with him by "grabb[ing] her around the neck." Defendant said that the victim told him that "she'd cooperate as long as [he] didn't hurt her . . . that she'd wait until she got back to her apartment before she called the law. Give [him] enough time, why she said that [he] d[idn't] know." Defendant repeated: "I just grabbed her around the neck and made her get over in the passenger's side and I got under the driver's seat. I didn't hurt her."

Defendant was trying to elude capture at the time he commandeered the victim's car in Shelby County.[4] He could have let her go but he deliberately and forcefully kept her in the car with him. His overarching concern was evading apprehension. The victim's contact with him added to the risk of his capture if she was allowed to speak with anyone. It was reasonable for the jury to infer that, at the time Defendant determined to keep the victim with him in the car, he determined to kill her. Defendant was in Shelby County at the time he forced the victim to leave the driver's seat and sit in the passenger's seat. Accordingly, we conclude that the State adduced sufficient proof for the jury to infer that Defendant determined to kill the victim while still in Shelby County and that Defendant thereby committed an element of the offense of premeditated murder while still in Shelby County. Venue in Shelby County for prosecution of the premeditated murder of Hillary Johnson was thereby established.

Defendant relies upon Reynolds v. State, 287 S.W.2d 15 (Tenn. 1956), for the proposition that a murder is presumed to have been committed where the body is found. Defendant's reliance is misplaced. In Reynolds, the defendant was convicted of second degree murder. The victim had last been seen alive in Wilson County, her body was found in Wilson County, her clothes were found

_____

[4]Lt. Blum testified that a Seessel's receipt was found in the victim's pocket. This receipt was dated Saturday, November 20, at 5:27 p.m. A Seessel's shopping bag was found near the location where Defendant abandoned the victim's car. This circumstantial evidence indicates that Defendant intercepted the victim after she left Seessel's, a supermarket located in Midtown Memphis. Defendant does not dispute venue as to the kidnapping and theft offenses. We therefore conclude that Defendant's initial apprehension of the victim occurred in Shelby County.

-11-

in Wilson County, and the victim "died from a broken neck which apparently would keep her from wandering around any." Id. at 16. In short, there was no proof adduced to rebut the presumption that her murder had been committed entirely in Wilson County. Id.

In this case, as set forth above, the victim was last seen alive by anyone other than Defendant in Shelby County and was kidnapped in Shelby County. Although her body was found in Fayette County, we have concluded that the jury was entitled to infer that Defendant determined to kill the victim while they were in Shelby County, thereby committing one of the elements of first degree premeditated murder in Shelby County. This case is, then, distinguishable from Reynolds.

Defendant is not entitled to a new trial on this basis.

## II. SUBSTITUTION OF TRIAL JUDGE

After the jury was sworn and opening statements had been made, but prior to any witnesses being called, the original trial judge announced that he had suffered a death in his immediate family. Stating that there was "simply no way [he] can proceed with this trial this week under these circumstances," the judge explained that he considered himself unable to proceed by reason of a "disability" as contemplated by Tennessee Rule of Criminal Procedure 25(a). The judge further explained that another trial judge was preparing to proceed with the trial. Defense counsel objected, requesting that the trial be continued instead. Defendant's objection was denied.

Later that afternoon, Judge Jon Kerry Blackwood from Somerville recommenced the trial. Defense counsel renewed their objection, stating that they "would consent to a continuance rather than having a special judge come in to hear the matter." Judge Blackwood overruled the objection, and the trial proceeded. Defendant now contends that the original trial judge should have declared a mistrial, arguing that the death in the original trial judge's immediate family did not constitute a "disability" under Rule 25(a). We disagree.

Our Rules of Criminal Procedure provide that,

> If by reason of death, sickness or *other disability* the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge regularly sitting in or who may be assigned to the court, upon certifying that he or she has become familiar with the record of the trial, may proceed with and finish the trial.

Tenn. R. Crim. P. 25(a) (emphasis added). The meaning of "other disability" in this provision is a matter of first impression in Tennessee.

Tennessee Rule of Criminal Procedure 25 is modeled after Federal Rule of Criminal Procedure 25. See Tenn. R. Crim. P. 25 Advisory Commission Comments. Neither our Rule nor its federal counterpart contains a definition of the term "other disability." See Fed. R. Crim. P. 25.

Our research has revealed no case addressing the issue of whether the term includes a death in the original judge's immediate family. We now hold that it does.

This Court has previously recognized that the rules of construction applicable to statutes are likewise applicable to the Rules of Criminal Procedure. State v. Crowe, 168 S.W.3d 731, 744 (Tenn. 2005). One of those rules of construction is "ejusdem generis," which means that "where general words follow special words which limit the scope of the statute, general words will be construed as applying to things of the same kind or class as those indicated by the preceding special words." Lyons v. Rasar, 872 S.W.2d 895, 897 (Tenn. 1994). With respect to Tennessee Rule of Criminal Procedure 25(a), the "special words" are "death" and "sickness." The general words are "other disability." Thus, we look to things of the same kind or class as a trial judge's death or sickness in construing the term "other disability."

Obviously, a judge's death renders him or her "unable to proceed with the trial." Similarly, a judge's illness may render him or her at least temporarily unable to proceed with the trial. Both of these events are beyond a judge's immediate control. Neither of these events is the result of a simple scheduling conflict or a conflict in professional priorities. All persons, in all walks of life, are subject to the sometimes sudden demands of their health.

Similarly, all persons, including trial judges, are subject to the sometimes sudden demands of the health of their immediate families. In this case, the original trial judge's mother-in-law died unexpectedly. As with a bout of serious personal illness, the personal demands upon the judge immediately became urgent and imperative. As with a bout of serious personal illness, those demands rendered the judge temporarily but unavoidably "unable to proceed with the trial." In terms of rendering a judge temporarily unable to proceed with a trial, we see little difference in cause or effect between a judge's own illness and a death in the judge's immediate family. Accordingly, we construe the term "other disability" as used in Tennessee Rule of Criminal Procedure 25(a) to encompass the death of an immediate family member of the original trial judge.

We note that the term "other disability" is not limited to "other *physical* disability." Thus, we do not construe the term as requiring that the judge experience some physical impairment to have suffered an "other disability."

We further note that subsection (b) of Rule 25 permits a substitution of judges after a verdict of guilt, where the original judge is unable to "perform the duties to be performed by the court after a verdict of guilt," "by reason of *absence*, death, sickness or other disability." Tenn. R. Crim. P. 25(b) (emphasis added). Because the term "other disability" is used in addition to the term "absence" in this provision, it is clear that the two terms have different meanings. Obviously, "absence" is a broader category than "other disability," although we construe the term "absence" in this provision as, again, being of the same "type" as "death, sickness, or other disability," in that it would be an absence caused by some unforseen and unavoidable event: for instance, travel delays caused by weather or accidents.

Upon the original judge's disability, a substitute judge may proceed with the trial "upon certifying that he or she has become familiar with the record of the trial." In this case, Judge Blackwood stated on the record that he had familiarized himself with the record in this cause. Judge Blackwood further entered an order certifying that he had "reviewed the pleadings in this matter and [had] sufficiently familiarized [himself] with the record in this matter in compliance with Rule 25 of the Tennessee Rules of Criminal Procedure." The trial then proceeded. Defendant points to no prejudice he suffered as a result of Judge Blackwood's assumption of the original judge's duties, and the record does not indicate that Defendant suffered any inherent prejudice resulting from the substitution. Both the original and substitute judges complied with Rule 25(a). We hold that Defendant was not entitled to a continuance or the declaration of a mistrial upon the original trial judge's disability and that he is not now entitled to a new trial on the basis of the substitution.

## III. ADMISSION OF PHOTOGRAPHS OF VICTIM

While talking to Defendant at the Oxford jail, Agent Sturgis displayed several photographs of the victim taken while she was a child. Either he or Agent Rinehart remarked, "She was a pretty childSshe was such a pretty child, and it's just a shame that we can't find her." Later, one of the agents said, "If we could just get her body back that the family could be resolved and it was coming up on Christmas timeSit was a very difficult time for the family, and if she was lying out somewhere, the animals might be getting to her, and that would just be so sad." It was sometime after the photographs had been displayed and these comments made that Defendant began describing to Agent Sturgis where the victim's body could be found.

During Agent Sturgis's testimony at trial, one of the prosecutors showed him an envelope, which Agent Sturgis identified as the one that had contained the photographs and on which Defendant had drawn a map to the victim's body. While examining the envelope, Agent Sturgis stated, "I believe there are still photos in here of the young lady." The prosecuting attorney thereupon asked that the envelope be made an exhibit to Agent Sturgis's testimony. Defense counsel objected to admission of the photographs contained in the envelope on the grounds that the photographs were not relevant. The trial court overruled the objection. Defendant now contends that the trial court thereby erred.

Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Id. at R. 403. The decision regarding the admissibility of photographs pursuant to these Rules lies within the sound discretion of the trial court

and will not be overturned on appeal absent a clear showing of an abuse of that discretion. State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978).

The challenged photographs appear to have figured into Defendant's motives in deciding to confess his murder of the victim to law enforcement. Defendant's motives in confessing would be at issueSand evidence relating to his motives thereby relevantSonly if the veracity of his confession was at issue. Except in the most general sense, however, the veracity of Defendant's confession was not before the jury. That is, Defendant did not attack at trial the credibility of his confession. Accordingly, the motives underlying his confession had only marginal relevance.[5] "In assessing probative value, the court must understand the proof and theory of the case, and whether there is a *real dispute* about the issue the evidence is to prove." Neil P. Cohen, Sarah Y. Sheppeard & Donald F. Paine, Tennessee Law of Evidence, § 403.[5] (5th ed. 2005) (emphasis added). There was no "real dispute" at trial about the veracity of Defendant's confession. His motives for making the confession were, therefore, of little probative value.

Given the marginal relevance of Defendant's motives in confessing, the probative value of the photographs was also only slight. The danger of unfair prejudice, on the other hand, was significant. We agree with the Court of Criminal Appeals that "the photographs taken throughout the victim's childhood had the distinct probability of appealing to the emotions of the jury." The very reason that Agent Sturgis displayed the photos to Defendant, and the fact that Defendant's sympathies were so stirred thereby that he finally confessed to murdering the victim, make plain the power possessed by these particular photographs. "Prejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence, 182-83 (2d ed. 1986)).

Moreover, the photographs were cumulative to Agent Sturgis' testimony about what prompted Defendant to confess. To the extent the jury needed to know why Defendant decided to tell law enforcement where the victim's body could be found, Agent Sturgis' testimony was sufficient to answer that question. The actual photographs viewed by Defendant were needlessly cumulative to that issue.

We hold, therefore, that the trial court erred in permitting the photographs to remain in the envelope that was admitted into evidence. See State v. Dicks, 615 S.W.2d 126, 128 (Tenn. 1981) (holding that photo of murder victim while alive should have been excluded "since it added little or nothing to the sum total knowledge of the jury"). While the State argues that the record does not reflect that the jury actually removed the photographs from the envelope and viewed them, we are not persuaded to adopt this line of reasoning. All of the exhibits admitted at trial were available to

_____

[5]The State argues that "the voluntariness and veracity of [Defendant's] ultimate confession was [sic] clearly an issue for the jury to resolve." While we agree that the jury had to determine ultimately whether Defendant's confession was true, the most damning piece of evidence against Defendant was his knowledge of where the victim's body was located. His motives in choosing to reveal this piece of unique information were, relatively speaking, of only minor importance.

the jury during its deliberations.  See Tenn. R. Crim. P. 30.1.  We do not require proof that jurors actually viewed components of exhibits in order to determine whether admission of the component was erroneous.

We are persuaded, however, that the trial court's error in permitting the photographs to be left in the envelope was harmless.  The proof in this case that Defendant murdered the victim, intentionally and with premeditation, is overwhelming.  While the jury's sympathies may have been stirred by the photographs of the victim as a child, we are convinced beyond any doubt that the jury would have rendered the same verdict of guilt had the photographs been excluded from the record.  Defendant is not entitled to a new trial on the basis of the trial court's erroneous admission of the photos.

Defendant also contends that the admission of the photos "served in the sentencing determination to divert the jury's attention from focusing on the individual circumstances of the defendant and his mitigation in violation of the Eighth and Fourteenth Amendments of the United States Constitution," and that the photos "must have weighed heavily upon the jury's mind when assessing whether to impose the death penalty."  While we have already determined that the photographs should not have been admitted during the guilt phase of Defendant's trial, we are not persuaded that they had a prejudicial impact upon the jury's sentencing deliberations.  As set forth more fully below, the State in this case adduced sufficient evidence to establish three aggravating circumstances, a single one of which would have entitled the jury to sentence Defendant to death.  None of the evidence adduced in support of these three aggravating circumstances included the photographs.  The prosecution did not mention the photographs during its opening statement or closing arguments in the penalty phase of Defendant's trial.  The trial court's instructions to the jury during the penalty phase did not include any reference to the photos.  Accordingly, we conclude that submission of the photographs to the jury did not prejudice Defendant during the sentencing phase of his trial.  Defendant is not entitled to a new sentencing hearing on the basis of the erroneously admitted photographs.

## IV.  SUFFICIENCY OF THE EVIDENCE

Defendant asserts that the evidence is not sufficient to establish that he murdered the victim with premeditation.  We disagree.

When evaluating the sufficiency of the evidence, we must determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  In making this determination, we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.  State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  Questions concerning the credibility of the witnesses, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the trier of fact.  Id.  Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the defendant upon

conviction bears the burden of showing why the evidence is insufficient to support the verdict. State v. Rice, 184 S.W.3d 646, 661 (Tenn. 2006); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Our criminal code provides that the term "premeditation" as used in our first degree murder statute refers to

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Factors supporting the existence of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, and preparation before the killing for concealment of the crime. Id. Additionally, the "establishment of a motive for the killing is another factor from which the jury may infer premeditation." State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001).

The proof in this case established that Defendant carjacked the victim and forced her to remain in the car with him. He commandeered the victim's car because he was trying to evade arrest. Defendant claimed to have assured the victim that he was not going to hurt her, from which the jury could have inferred that Defendant had endeavored to keep the victim from trying to escape. Contrary to his assurances, Defendant subsequently drove the victim to a remote area and stabbed her in the back, leaving the knife blade embedded in her chest. The victim was unarmed when Defendant stabbed her. While she was still moving, Defendant dragged the victim some twenty yards and hid her body under some sheets of tin. He then left her to die, driving away and out of the state in her car.

Defendant's motive in his murderous crime spree began and ended with his attempt to avoid apprehension. He carjacked the victim with that goal in mind and determined to kill her with that goal in mind. The manner and circumstances of the killing support the jury's inference that Defendant killed the victim intentionally and with premeditation. The evidence is sufficient to support Defendant's conviction of first degree premeditated murder. Accordingly, Defendant is not entitled to relief on this ground.

## V.  VICTIM IMPACT EVIDENCE

Defendant avers that the testimony of Dr. Sundstrom and Ms. McPike went far beyond properly admissible victim impact evidence and thereby violated his due process rights to a "fundamentally fair penalty determination." The State disagrees.

-17-

Initially, we note that Dr. Sundstrom and Ms. McPike were the first witnesses to testify during the sentencing phase of Defendant's trial. We determined in State v. Nesbit, however, that "victim impact evidence should not be admitted until the trial court determines that evidence of one or more aggravating circumstances is already present in the record." 978 S.W.2d 872, 891 (Tenn. 1998). Defendant did not object to the order of the State's proof and does not raise this issue on appeal. Moreover, proof of Defendant's motive for killing the victim, relevant to the (i)(6) aggravating circumstance, and proof that he committed the murder during his theft of the victim's car, relevant to the (i)(7) aggravating circumstance, had been admitted during the guilt phase of his trial. Accordingly, we hold that any error resulting from the order of the State's proof during the sentencing phase was harmless. See State v. Austin, 87 S.W.3d 447, 463-64 (Tenn. 2002) (finding harmless error where victim impact evidence was introduced before trial court determined that evidence of aggravating circumstances was in record).

Our criminal code provides that

The court shall permit a member or members, or a representative or representatives of the victim's family to testify at the [capital] sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons.

Tenn. Code Ann. § 39-13-204(c) (Supp. 1999). This Court has previously held that this provision "does not expressly restrict or limit the introduction of other types of victim impact evidence authorized by law developed in our prior cases." State v. McKinney, 74 S.W.3d 291, 309 (Tenn. 2002). Rather, victim impact evidence may fall into three categories: "[1] information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, [2] the contemporaneous and prospective circumstances surrounding the individual's death, and [3] how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family." Nesbit, 978 S.W.2d at 891 (footnote omitted). As we recognized in McKinney, "the statutory provision essentially identifies the third of these categories." 74 S.W.3d at 309.

In McKinney, a coworker of the murder victim testified about the victim's service as a police officer, including a description of the victim's duties and activities. We noted that the witness's testimony "was limited to factual backgroundShe did not testify about the effect of the victim's death on himself, other officers, society, or the Memphis Police Department." Id. at 310. We concluded that this testimony was "limited to providing a 'brief glimpse' into the life of the victim and that such a glimpse did not violate the defendant's right to due process or equal protection." Id.

In our earlier decision in Nesbit, we emphasized that "not any and all victim impact evidence the prosecution wishes to offer at a capital sentencing hearing is admissible." 978 S.W.2d at 891. We further recognized that "there is no bright-line test, and the admissibility of specific types of victim impact evidence must be determined on a case-by-case basis." Id. "[S]uch evidence . . . should be closely scrutinized and restrained so as not to be unduly prejudicial or appeal to the

emotions or sympathies of the jury." McKinney, 74 S.W.3d at 309. Further, "victim impact evidence which threatens to render the trial fundamentally unfair or which poses a danger of unfair prejudice is not appropriate and should be excluded by the trial judge." Nesbit, 978 S.W.2d at 891. We turn now to the victim impact evidence at issue in this case.

We agree with the Court of Criminal Appeals that the majority of Dr. Sundstrom's testimony went beyond the scope of that victim impact evidence contemplated by our decision in Nesbit. In line with McKinney, his testimony about the victim's duties and activities while a student and teaching assistant at the University of Memphis was proper. However, the majority of Dr. Sundstrom's testimony was about the effect of the victim's death on everyone in his department: undergraduate students, graduate students, and faculty. He testified that the department "ground to a halt": students were unable to complete their work and professors unable to teach their classes. He went so far as to claim that the murder threatened the career aspirations of some of the students.

Dr. Sundstrom's testimony detailed the far-reaching effects that a single murder can have. His description of the virtual collapse of the philosophy department illustrated how interwoven a single individual's life is with many others. To that extent, his testimony had probative value. See Payne v. Tennessee, 501 U.S. 808, 825 (1991) (recognizing that the prosecution has a legitimate interest in adducing proof that "'the victim is an individual whose death represents a unique loss to society'") (quoting Booth v. Maryland, 482 U.S. 496, 517 (1987)). We are constrained to conclude, however, that the danger of unfair prejudice was such as to outweigh the probative value of this proof. Dr. Sundstrom's testimony was not limited to a "brief glimpse" of the victim's life, but rather laid the debilitating grief of over one hundred people at Defendant's feet. The risk of inflaming a jury's passions with such testimony is simply too great to allow its admission.

We also agree with the Court of Criminal Appeals that portions of Ms. McPike's testimony should not have been admitted. Ms. McPike testified that one of the victim's friends had been in therapy since the murder and "was afraid she would take her own life because of this." Again, this testimony exceeds the scope of permissible victim impact evidence. We further conclude that Ms. McPike should not have been allowed to testify that the victim had "a whole army of friends out here" and that "friends all over the world will never have her again." Such testimony goes beyond describing the effect of the victim's murder on her family and beyond providing a glimpse into her life. See State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998) (holding that victim's mother's testimony about how the murders had adversely affected the entire community exceeded the scope of victim impact evidence contemplated by Nesbit).

Notwithstanding the erroneous admission of this evidence, we conclude that the trial court's error in this regard did not render the proceedings fundamentally unfair or unduly prejudicial to Defendant. See Burns, 979 S.W.2d at 283. The prosecutor's reference to this testimony was limited during closing argument to the following: "Dr. Sundstrom and Nancy McPike took the stand and testified about the emotional and psychological impact of Hillary Johnson's murder in those two communities. That is notSthat is not an aggravating circumstance for you to consider." The trial court later instructed the jury:

The prosecution has introduced what is known as victim-impact evidence. This evidence has been introduced to show the financial, emotional, psychological, or physical effects of the victim's death on the members of the victim's immediate family.

You may consider this evidence in determining an appropriate punishment; however, your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the victimSpardon meSnot as an emotion [sic] response to the evidence.

Victim-impact evidence is not the same as an aggravating circumstance. Proof of an adverse impact on the victim's family is not proof of an aggravating circumstance. Introduction of this victim-impact evidence, in no way, relieves the state of its burden to prove, beyond a reasonable doubt, at least one aggravating circumstance which has been alleged. You may consider this victim-impact evidence in determining the appropriateness of the death penalty, only if you first find that the existence of one or more aggravating circumstances has been proven, beyond a reasonable doubt, by evidence independent from the victim-impact evidence and find that the aggravating circumstance or circumstances found outweigh the finding of one or more mitigating circumstances beyond a reasonable doubt.

This instruction conforms with that required by Nesbit, 978 S.W.2d at 892. Furthermore, testimony about the victim's importance to her friends and her graduate department had already come before the jury during the guilt phase of the trial. Ms. McPike had testified,

Hillary was a girl who made friends fast. She would go down to the park and come home and say, "I met some friends today." And we would look at her and say, "How can they be your friends because it's only a day?" She developed very warm relationships very quickly. She had great, great students to be friends with there at the university. They were terrified themselves.

The jury in this case determined that the State proved three aggravating circumstances: (a) Defendant was previously convicted of one or more felonies, other than the present charges, the statutory elements of which involve use of violence to the person; (b) Defendant committed the offense for the purpose of avoiding, interfering with, or preventing his lawful arrest or prosecution; and (c) Defendant knowingly committed the murder while he had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, theft. See Tenn. Code Ann. § 39-13-204(i)(2), (6) and (7). As set forth below, we have determined that the evidence is sufficient to support each of these aggravating circumstances. The jury could have properly sentenced Defendant to death on the basis of a single one of these circumstances. See id. at (i).

The jury heard several minutes of victim impact testimony that it should not have heard. However, the trial court properly instructed the jury about how it was to consider this evidence. The jury is presumed to follow its instructions. State v. Shaw, 37 S.W.3d 900, 904 (Tenn. 2001). Moreover, the prosecution did not rely on or stress the erroneously admitted testimony during closing arguments. We are therefore convinced beyond a reasonable doubt that the jury would have sentenced Defendant to death even had it not heard the improperly admitted testimony. Accordingly, Defendant is entitled to no relief on this basis.

## VI. INSTRUCTION REGARDING PRIOR VIOLENT FELONIES

The State introduced proof during the sentencing phase that Defendant had been convicted in 1974 of three counts of robbery with a deadly weapon and one count of rape. All of these convictions arose in Tennessee. The State also adduced proof that Defendant had been previously convicted in Mississippi of kidnapping and manslaughter, and in Alabama of robbery in the first degree. The trial court subsequently instructed the jury as follows:

> The defendant was previously convicted of one or more felonies other than the present charge, the statutory elements of which involve the use of violence to the person. The state is relying upon the crimes of robbery first-degree, robbery with a deadly weapon, kidnaping, manslaughter, and rape, which are felonies, the statutory elements of which involve the use of violence to the person.

See Tenn. Code Ann. § 39-13-204(i)(2). Defendant now contends that the trial court erred in instructing the jury that each of these felonies was a crime whose statutory elements involve the use of violence to the person, arguing that it was up to the jury to determine that issue. In making this argument, Defendant relies on Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny.

We have previously rejected this argument in State v. Cole, 155 S.W.3d 885, 904 (Tenn. 2005). In Cole, we reexamined our decision in Sims, 45 S.W.3d at 11-12, in which we set forth the procedure for a trial court to follow where the State alleges that a capital defendant has a prior conviction for a felony whose statutory elements involve the use of violence to the person. In Sims, the defendant had two prior convictions for aggravated assault. Recognizing that the offense of aggravated assault may be committed with or without violence to the person, this Court held:

> In determining whether the statutory elements of a prior felony conviction involve the use of violence against the person for purposes of § 39-13-204(i)(2), we hold that the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied with or without proof of violence.

Sims, 45 S.W.3d at 11-12. Reexamining this holding in Cole in response to the defendant's Apprendi argument, we held:

The Sims procedure involves a legal determination, and as such this procedure does not transgress the dictates of Apprendi and its progeny. The (i)(2) aggravating circumstance requires only that the *statutory elements* of the prior felony involve the use of violence to the person. The Sims procedure authorizes trial judges merely to examine the facts, record, and evidence *underlying* the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence.

Cole, 155 S.W.3d at 904.

We again upheld the Sims procedure in two recent cases. In Rice, 184 S.W.3d at 668-69, we considered the Sims procedure in light of the United States Supreme Court's recent decision in Shepard v. United States, 544 U.S. 13 (2005). In Shepard, the Court held that, in determining the underlying character of a predicate offense to which the defendant had pled guilty, the trial court "is generally limited to examining the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." Id. at 16. When the prior conviction resulted from a jury trial, the trial court is limited to examining the charging documents filed in the court of conviction and instructions given to the jury. Id. at 20 (citing Taylor v. United States, 495 U.S. 575 (1990)). In Rice, we determined that "Shepard does not change a judge's ability to find the 'fact of a prior conviction,'" but simply limits "the scope of the judge's inquiry to reliable judicial records regarding the prior conviction and precludes the judge from re-examining the facts underlying that conviction." 184 S.W.3d at 669. Similarly, we held in State v. Ivy, 188 S.W.3d 132, 151 (Tenn. 2006), that "Shepard clarifies but does not invalidate the procedures this Court adopted in Sims." Thus, when the State alleges prior violent felony convictions, the statutory elements of which do not necessarily involve the use of violence to the person, the trial court must conduct the Sims analysis, limiting its inquiry to the records delineated by Shepard. We turn now to the prior felonies relied upon by the State in this case.[6]

Defendant was convicted in 1974 of four felonies he committed in Tennessee in 1972: three robberies with a deadly weapon and one rape. In support of the robbery convictions, the prosecution provided to the trial court certified copies of the indictments and minute entries signed by the judge reflecting Defendant's pleas of guilty thereto. In 1972, our statute defining the crime of robbery provided that "[r]obbery is the felonious and forcible taking from the person of another, goods or money of any value, by violence or putting the person in fear." Tenn. Code Ann. § 39-3901 (Supp. 1972). In Defendant's three cases, each of the indictments alleging the robberies specifies that

---

[6]Prior to presenting any proof to the jury, the prosecution provided to the trial court certified copies of documents reflecting Defendant's prior convictions. The trial court conducted its Sims analysis on the basis of these documents.

Defendant committed the crime by use of a pistol and "did then and there unlawfully and feloniously and with force and violence aforesaid, steal, take and carry away from the person of [the named victim]" a sum of money. Defendant pleaded guilty to each of these indicted offenses as charged. Accordingly, the trial court did not err in determining that the statutory elements of these three crimes involved violence to the person. See McKinney, 74 S.W.3d at 305-06 (recognizing that "the use of a deadly weapon, such as pointing a gun at the victim, constitutes violence.").

As to the rape conviction, the indictment charging Defendant with this crime alleges that he "did unlawfully and feloniously have unlawful carnal knowledge of [the named victim], a female, twelve (12) years of age, forcibly and against her will." A jury determined Defendant to be guilty of this crime as charged. In 1972, at the time Defendant committed this offense, rape was defined by our criminal code as "the unlawful carnal knowledge of a woman, forcibly and against her will." Tenn. Code Ann. § 39-3701 (1955). Thus, the trial court did not err in concluding that the statutory elements of this crime involve the use of violence to the person.

Defendant pleaded guilty to committing "robbery first degree" in 1981 in Alabama. That crime is defined as the commission of a robbery in the third degree while armed with a deadly weapon or dangerous instrument, or in which the accused causes serious physical injury to another. Ala. Code 1975 § 13A-8-41 (2006). Robbery in the third degree is defined, in turn, as, in the course of committing a theft, the accused uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance, or threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property. Id. at § 13A-8-43. The indictment alleging the crime to which Defendant pleaded guilty, a certified copy of which was admitted into evidence, provides that Defendant "did, in the course of committing a theft, . . . use force against the person of [named victim], with the intent to overcome her physical resistance or physical power of resistance, while armed with a deadly weapon." Also in the record is a certified copy of Defendant's guilty plea to this charge. The trial court committed no error in determining that the statutory elements of the robbery to which Defendant pleaded guilty involved the use of violence to the person.

It is obvious without further comment that the crime of manslaughter, which Defendant pleaded guilty to committing in November 1999 in Mississippi,[7] is an offense the statutory elements of which involve the use of violence to the person.

We turn now to Defendant's conviction in Mississippi of kidnapping. In 1999, the Mississippi criminal code defined that offense as follows:

> Any person who shall without lawful authority forcibly seize and confine any other person, *or* shall inveigle *or* kidnap any other person with intent to cause such

---

[7]In support of this conviction, the State introduced certified copies of the indictment (charging capital murder), Defendant's written plea of guilty, and the judgment of sentence on the plea of guilty.

person to be secretly confined or imprisoned against his or her will, . . . shall, upon conviction, be imprisoned for life in the state penitentiary if the punishment is so fixed by the jury in its verdict.

Miss. Code Ann. § 97-3-53 (2000) (emphasis added). The Mississippi Supreme Court has recognized that, under this statute, "the crime of kidnapping may be accomplished by trickery and deceit as well as by force." Wilcher v. State, 448 So. 2d 927, 935 (Miss. 1984). Thus, the statutory elements of this crime do not necessarily involve the use of violence to the person.

The indictment charging Defendant with kidnapping[8] recites that, on or about November 15, 1999, Defendant "did then and there unlawfully, willfully, feloniously and without authority of law forcibly seize and confine, inveigle, *or* kidnap" the named victim. (emphasis added). The Judgment of Guilt on Jury Verdict reflects simply that the jury found Defendant "guilty of kidnaping but are unable to fix the penalty." The State did not present the trial court with the jury instructions provided to the jury at Defendant's kidnapping trial.

We conclude that the information provided to the trial court was not a sufficient basis upon which to conclude that the statutory elements of the kidnapping of which Defendant was convicted necessarily involved the use of violence to the person.[9] Accordingly, we are forced to conclude that the trial court erred when it instructed the jury that it could consider Defendant's kidnapping conviction in determining whether to apply the (i)(2) aggravating circumstance.

We determined in Ivy that the appropriate analysis to use in addressing this error is analogous to that utilized in State v. Howell, 868 S.W.2d 238, 259-62 (Tenn. 1993), where an aggravating circumstance was held invalid but other valid aggravating circumstances remained. See Ivy, 188 S.W.3d at 152. In that event, the invalid aggravating circumstance is harmless if the reviewing court concludes "beyond a reasonable doubt that the sentence would have been the same had the jury given no weight to the invalid . . . aggravating [circumstance]." Howell, 868 S.W.2d at 262. We cautioned, however, that

> [i]n order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely

---

[8] A certified copy of the indictment is contained in the record.

[9] We recognize that the State also adduced testimony from the kidnapping victim about the crime during the sentencing phase of Defendant's trial. Our legislature has authorized such testimony. See Tenn. Code Ann. § 39-13-204(c) ("In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction."). A victim's testimony at a subsequent trial does not, however, establish for the trial court the statutory elements upon which the conviction rested. That is a legal determination requiring an examination of the relevant records from the *original* prosecution.

examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

Id. at 260-61 (footnote omitted).

In this case, the record demonstrates that the trial court's error was harmless beyond a reasonable doubt. The jury was properly instructed about Defendant's prior convictions of manslaughter, four counts of armed robbery, and one count of rape. These prior convictions, particularly the manslaughter and rape, were objectively reliable and qualitatively persuasive as to the (i)(2) aggravating circumstance. Furthermore, the jury was properly instructed on the (i)(6) and (i)(7) aggravating circumstances, i.e., the killing was committed to avoid lawful arrest or prosecution, and was knowingly committed in the perpetration of a theft. While the prosecutor made a brief reference to the kidnapping in her closing arguments and several references to "seven" prior convictions in support of the (i)(2) aggravating circumstance, the transcript demonstrates that the prosecutor's arguments would have been no less effective with no reference to the kidnapping and references to "only" six prior convictions. Moreover, the transcript demonstrates that the prosecutor placed about as much emphasis on the evidence supporting the other two aggravating circumstances. Finally, the "nature, quality and strength" of the mitigating evidence was minimal, as Defendant chose not to adduce any such proof.

In sum, we are convinced beyond a reasonable doubt that the jury would have sentenced Defendant to death even without the trial court's erroneous instruction regarding Defendant's kidnapping conviction. Defendant is entitled to no relief on this basis.

## IV. MANDATORY REVIEW

When a defendant has been sentenced to death, we must conduct a mandatory review of the sentencing process pursuant to Tennessee Code Annotated section 39-13-206(c)(1). That provision of our criminal code requires us to determine whether (1) the death sentence was imposed in any arbitrary fashion; (2) the evidence supports the jury's finding of statutory aggravating circumstances; (3) the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances; and (4) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant. Id.

### A. Imposition of Death Penalty

Initially, we find that the sentencing phase of Defendant's trial was conducted pursuant to the procedure established in the applicable statutory provisions and rules of criminal procedure. Accordingly, we conclude that the death penalty was not imposed in an arbitrary fashion.

### B. Sufficiency of Aggravating Circumstances

We turn now to the sufficiency of the evidence supporting the jury's finding of statutory aggravating circumstances: (a) Defendant was previously convicted of one or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person; (b) Defendant committed the offense for the purpose of avoiding, interfering with, or preventing his lawful arrest or prosecution; and (c) Defendant knowingly committed the murder while he had a substantial role in committing theft. See id. § 39-13-204(i)(2), (6), (7). We must now review the evidence supporting each of these aggravating circumstances in the light most favorable to the State and determine whether a rational trier of fact could have found the existence of each beyond a reasonable doubt. State v. Bane, 57 S.W.3d 411, 426 (Tenn. 2001).

### 1. Prior Convictions

As set forth above, the State introduced proof that Defendant had been previously convicted of four counts of robbery involving a deadly weapon, one count of manslaughter, one count of rape, and one count of kidnapping. Although we have held that the trial court erred in allowing the kidnapping conviction to be used as proof of this aggravating circumstance, the proof of the remaining convictions was proper and more than sufficient to support the jury's finding of this aggravating circumstance. See Tenn. Code Ann. § 39-13-204(i)(2).

### 2. Murder Committed to Avoid Arrest or Prosecution

Defendant contends that the evidence is not sufficient to establish that he killed the victim in order to avoid his arrest and prosecution. See id. at (i)(6). We disagree. This aggravating circumstance focuses on a defendant's motives in killing the victim. Ivy, 188 S.W.3d at 149; State v. Reid, 164 S.W.3d 286, 315 (Tenn. 2005); Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001). Although there must be some "particular proof" supporting this aggravating circumstance, State v. Hartman, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim. Terry, 46 S.W.3d at 162.

In this case, Defendant admitted that he commandeered the victim's car because he was "on the run" from law enforcement for crimes he committed elsewhere. He could have ejected the victim from her car at the moment he took it, but he forced her to remain in the car with him. He subsequently drove her to a remote location, stabbed her, and concealed her body. Defendant then fled the state in the victim's car. This proof was sufficient to establish that Defendant killed the victim at least in part to prevent his apprehension. See, e.g., Reid, 164 S.W.3d at 316 (proof supported (i)(6) aggravating circumstance where defendant robbed and kidnapped the victims, took them to a remote area, stabbed them, and abandoned them); State v. Powers, 101 S.W.3d 383, 399 (Tenn. 2003) (proof supported (i)(6) aggravating circumstance where defendant abducted victim from her driveway, drove her to a remote location, robbed and killed her, and left her body in a storage room). Application of this aggravating circumstance is supported by sufficient proof.

-26-

### 3.  Killing Committed During Theft

Our criminal code provides that an aggravating circumstance is established where

> [t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb[.]

Tenn. Code Ann. § 39-13-204(i)(7).  The proof in this case is uncontroverted that Defendant stabbed the victim to death with a single blow to her back following his theft of her car.  The stab wound was so powerful that the knife blade was left embedded in the victim's body, the knife handle gone.  The victim was unarmed at the time Defendant killed her.  After killing the victim and concealing her body, Defendant drove away in the victim's car.  This proof is more than sufficient to establish that Defendant knowingly murdered the victim in conjunction with his theft of her car.

### C.  Aggravating Circumstances Outweigh Mitigating Circumstances

During the sentencing phase of Defendant's trial, the defense presented no proof of any mitigating circumstances that might counteract the State's proof of aggravating circumstances.  Proof in the nature of mitigating circumstances presented during the guilt phase of Defendant's trial consisted of Agent Sturgis's testimony about Defendant's cooperation in locating the victim's body, his remorse for the killing, and his weeping at the scene where the victim's body was found.  Also, a waiver of rights form signed by Defendant indicates that he has a third-grade education.[10]  We conclude that the State's proof of aggravating circumstances outweighs any mitigating circumstances beyond a reasonable doubt.

### D.  Proportionality

We turn now to our analysis of whether the sentence imposed in this case is excessive or disproportionate to the penalty imposed in similar cases.  This review identifies aberrant, arbitrary,

---

[10]The trial court instructed the jury about mitigating circumstances as follows:
[T]he jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence which shall include but are not limited to the following: No. 1. Any testimony that he was cooperative in assisting to find the victim's body, thus allowing the family to give her a proper burial. No. 2. Any testimony he cried showing remorse when he arrived at law enforcement office in Fayette County to recover the victim's body. No. 3. Any testimony showing that he only has a third-grade education. No. 4. Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing; that is you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant, which is supported by the evidence.  No distinction shall be made between the mitigating circumstances listed and those otherwise raised by the evidence.

or capricious sentencing by determining whether the death sentence is "'disproportionate to the punishment imposed on others convicted of the same crime.'" Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43 (1984)). We begin with the presumption that a death sentence is proportional with the crime of first degree murder. State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998).

In conducting this review, we employ the precedent-seeking method of comparative proportionality review, in which we compare this case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 665-67. While no defendants or crimes are identical, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668. Our inquiry, however, does not require a finding that "a sentence less than death was never imposed in a case with similar characteristics." Id. at 665. This Court has repeatedly held that the pool of cases considered by this Court in its proportionality review includes "those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death." Reid, 164 S.W.3d at 316.

In reviewing the applicable pool of cases, we consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. Bland, 958 S.W.2d at 667. In addition, we consider numerous factors about the defendant: (1) prior criminal record or activity; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id.; see also Bane, 57 S.W.3d at 428-29.

In this case, Defendant kidnapped a man in Mississippi, killed another man there, and then began stealing vehicles with which to evade the police. When Defendant learned from his niece in Memphis that he had been tracked to that location, he carjacked the victim's car as she was stopped at a stop sign. He then violently forced her to switch places with him, keeping her in the car with him while assuring her that he would not hurt her. In order to prevent her from assisting in his apprehension, Defendant subsequently drove the victim to a remote location and killed her by stabbing her once in the back with such force that the knife blade remained embedded in her back. The victim was unarmed. While she was still moving, Defendant dragged her body about twenty yards and covered her with sheets of tin. Defendant then abandoned the victim to die.

The victim was a young woman attending graduate school in Memphis. She left behind a father, mother, younger brother, grandmothers, coworkers and friends. The victim had no prior knowledge of Defendant but was, rather, a completely random victim who tragically happened to be in the wrong place at the wrong time. There was absolutely no justification for her murder.

Defendant is a white male, fifty-four years old at the time he murdered the victim. He has a long history of violent crimes, including a prior killing. He denied his role in the victim's death for several days. Although he finally cooperated with the authorities, he did so in order to relieve his own torment. He has expressed some remorse for his actions. Defendant exhibits no potential for rehabilitation.

In State v. Thacker, 164 S.W.3d 208 (Tenn. 2005), the defendant tried to use a stolen credit card at a service station. The station owner would not return the card after it was rejected. The defendant knew he was "wanted in other states," so he stabbed the station owner to death and "took off." The jury convicted the defendant of first degree murder and sentenced him to death after finding two aggravating circumstances: the defendant committed the murder in order to avoid his prosecution, and he committed the murder in the course of committing a first degree murder, arson, rape, robbery, burglary, or theft. See Tenn. Code Ann. § 39-13-204(i)(6), (7). This Court affirmed the sentence of death.

In State v. Blanton, 975 S.W.2d 269 (Tenn. 1998), the defendant had escaped from a Kentucky prison with seven other inmates. The defendant and two other escapees traveled to Tennessee where they shot and stabbed to death a couple in their home. Defendant and his cohorts then stole the couples' vehicle and fled the area. The jury convicted the defendant of two counts of first degree premeditated murder and sentenced him to death on both murders, applying three aggravating circumstances: the defendant had prior violent felonies, he committed the murders to avoid arrest and/or prosecution, and he committed the murders in the course of committing any first degree murder, arson, rape, robbery, burglary, larceny, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb. See Tenn. Code Ann. § 39-13-204(i)(2), (6), (7). The jury applied as a fourth aggravating circumstance to defendant's murder of the wife that it was especially heinous, atrocious or cruel. See id. at (i)(5). The defendant's two codefendants were also sentenced to death for their participation in the murder of the wife, with the jury applying the same four aggravating circumstances plus circumstance (i)(8) (murder committed during escape from lawful custody or from a place of lawful confinement). See Hall, 976 S.W.2d at 123. This Court upheld all of these death sentences.

In State v. Bates, 804 S.W.2d 868 (Tenn. 1991), the defendant had escaped from a Kentucky jail. He broke into a home and stole a shotgun. While on foot near an interstate in Tennessee, where he intended to steal a car, the defendant came upon the victim, a twenty-eight year old female mechanical engineer visiting the area during the course of her work. The victim was jogging. The defendant pulled the shotgun on her and walked her into some nearby woods. The defendant told the victim that he was not going to hurt her, that he needed her to drive him to Chattanooga because he was on the run. The defendant tied the victim to a tree, gagged her, and told her he was going to retrieve her car from her motel. The defendant then stepped behind the victim and shot her once in the back of the head, killing her. The defendant hid the victim's body under some branches and brush and then stole her car and some traveler's checks. After convicting the defendant of first degree murder, the jury sentenced the defendant to death, applying the (i)(2), (6), and (7) aggravating circumstances. This Court upheld the death sentence.

In State v. Thompson, 768 S.W.2d 239 (Tenn. 1989), the defendant and a juvenile female traveled together by bus from Georgia to Tennessee. They spent the night at an acquaintance's house. When the acquaintance discovered that the two were not married, she called and reported the juvenile as a runaway. The two left and loitered at a nearby Wal-Mart. There, the defendant abducted a woman at knife-point and forced her to drive them to a remote location. The defendant then stabbed the woman to death, leaving her body on the ground and stealing her car. The jury convicted the defendant of first degree murder and sentenced him to death, applying the (i)(5), (6), and (7) aggravating circumstances. This Court upheld the death sentence.

In State v. Carter, 714 S.W.2d 241 (Tenn. 1986), the defendant apprehended a man at a truck stop in order to steal the man's vehicle to use in a planned robbery. The defendant took the man to a cliff above a lake, shot and killed him, and rolled his body over the cliff. The defendant then absconded in the victim's vehicle. The jury convicted the defendant of first degree murder and sentenced him to death, applying the (i)(6) and (7) aggravating circumstances. This Court upheld the death sentence.

This Court has upheld the death penalty in numerous cases where the sole aggravating circumstance was the defendant's prior conviction of a violent felony offense. See, e.g., McKinney, 74 S.W.3d at 314 (upholding death sentence of defendant convicted of premeditated murder for shooting and killing an off-duty police officer at night club where sole aggravating circumstance was based on defendant's prior conviction of aggravated robbery); State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000) (upholding death sentence of defendant convicted of felony murder for shooting and killing victim during robbery where sole aggravating circumstance was based on defendant's prior convictions of attempted especially aggravated robbery and attempted first degree murder); State v. Keough, 18 S.W.3d 175 (Tenn. 2000) (upholding death sentence of defendant convicted of premeditated murder for stabbing and killing estranged wife during argument where aggravating circumstance was based on defendant's prior convictions for assault to commit voluntary manslaughter and manslaughter); State v. Smith, 993 S.W.2d 6 (Tenn. 1999) (upholding death sentence of defendant convicted of felony murder for shooting and killing victim during robbery where aggravating circumstance was based on defendant's prior convictions of robbery and first degree murder); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987) (upholding death sentence of defendant convicted of first degree murder for shooting and killing estranged girlfriend's friend where aggravating circumstance was based on defendant's prior convictions of second degree murder and aggravated assault). As this Court has frequently stated, this aggravating circumstance is "more qualitatively persuasive and objectively reliable than other[]" aggravating circumstances. Howell, 868 S.W.2d at 261.

Based upon our review of these and many other cases in which this Court has upheld a sentence of death following a conviction of first degree murder, we conclude that the sentence imposed in this case is neither excessive nor disproportionate to the penalty imposed in similar cases.

**CONCLUSION**

In accordance with Tennessee Code Annotated section 39-13-206(c)(1) and the principles adopted in prior decisions, we have considered the entire record in this case and conclude that the sentence of death has not been imposed arbitrarily, that the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances beyond a reasonable doubt, and that the sentence is not excessive or disproportionate.

We have reviewed all of the issues raised by Defendant and conclude that they do not warrant relief. With respect to issues that were raised in this Court but not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are incorporated herein and are attached as an appendix. Defendant's convictions of first degree premeditated murder, especially aggravated kidnapping, and theft over $1,000 but less than $10,000 are affirmed. The sentence of death for the murder, the sentence of sixty years for the especially aggravated kidnapping, and the sentence of twelve years for the theft are affirmed. The sentence of death shall be carried out as provided by law on the 2nd day of November, 2006, unless otherwise ordered by this Court or other proper authority. It appearing that Defendant Leonard J. Young is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE

-31-