# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs December 6, 2011

## STATE OF TENNESSEE v. NERO OSWALD JONES

### Direct Appeal from the Circuit Court of Hardeman County
### No. 35CC1-2010-CR-82     J. Weber McCraw, Judge

---

### No. W2011-00465-CCA-R3-CD  - Filed March 30, 2012

---

Nero Oswald Jones ("the Defendant") appeals jury convictions for first degree premeditated murder and voluntary manslaughter, claiming that the trial court erred in: (1) allowing statements made by the Defendant to law enforcement officials; (2) excluding the Defendant's line of questioning on cross-examination of a witness regarding potential bias based upon alleged romantic interest; (3) excluding testimony of one witness purporting to impeach the testimony of another witness; and (4) allowing the testimony of a lay witness based on her experience with firearms.  The Defendant also challenges the sufficiency of the evidence for both convictions.  After a thorough review of the record and the applicable law, we affirm the Defendant's convictions.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments
### of the Circuit Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

William L. Johnson and David Stowers, Memphis, Tennessee, for the appellant, Nero Oswald Jones.

Robert E. Cooper, Jr., Attorney General & Reporter; Clarence E. Lutz, Assistant Attorney General; Mike Dunavant, District Attorney General; Joe Van Dyke and Lisa Borden, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

The Defendant was indicted on May 3, 2010, on two counts of first degree premeditated murder. On June 15, 2010, the Defendant filed a motion to suppress his statements made to law enforcement officials on December 29 and 30, 2009. The Defendant argued that these statements were inadmissible because they were taken in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendment rights of the United States Constitution and article 1, sections Seven, Eight, and Nine of the Tennessee Constitution.

## A. Proof at Suppression Hearing

Investigator Bill Davis of the Hardeman County Sheriff's Office testified at the suppression hearing that, on December 29, 2009, he arrived at what he understood to be the scene of a possible murder. Upon arrival, he saw a car in a ditch with two male occupants who appeared to be deceased. Investigator Davis observed shell casings at the scene. He also learned that the Defendant's father had called the sheriff's office to inform law enforcement officials that his son had been involved in the shooting. The Defendant's father requested that someone speak with the Defendant. Investigator Davis and Sheriff Hicks then left the scene of the crime and proceeded to the father's home. They detained the Defendant at his father's house, placing the Defendant in the back of a patrol car. According to Investigator Davis, the Defendant "appeared to be excited." He could not recall whether he smelled alcohol on the Defendant's breath. While in the car, the Defendant began making statements about the events that had occurred. At that point, Investigator Davis verbally informed the Defendant of his Miranda rights because he did not have any written waivers with him.

Investigator Davis testified that the Defendant then gave statements that were made both independently and in response to questions. According to Investigator Davis, the Defendant stated that the two victims had robbed him or had beaten him up at his residence earlier in the evening and that he located the two victims with some other individuals and shot them. From the Defendant's statement, it was apparent that the Defendant obtained the weapon after getting beaten up or robbed and prior to shooting the victims.

On cross-examination, Investigator Davis acknowledged that he did not ask the Defendant how far he went in school. After the Defendant gave his statement, the Defendant requested that the officers take him to the scene of the shooting for him to show the officers where he allegedly disposed of the weapon. Once they arrived back at the jail, Investigator

Davis witnessed the Defendant receiving his Miranda rights again, this time with a written waiver. Investigator Davis did not participate in the interview at the jail.

Investigator Steaven Joy[1] of the Hardeman County Sheriff's Department testified that he was called to the scene of a possible murder investigation on the evening of December 29, 2009. Once back at the jail, he witnessed the Defendant sign a written document advising the Defendant of his Miranda rights and waiving those rights. Investigator Joy read the document at the hearing, which included advisements of the right to remain silent; the right to consult with an attorney; that in the event the Defendant could not afford an attorney, one would be appointed; and the right to stop answering questions at any time should the Defendant decide to waive those rights.

Investigator Joy stated that the Defendant was somewhat excited when the officers took his statement at the jail on the night of the shooting. He could not recall whether the Defendant's clothes were muddy or clean. Additionally, he did not smell alcohol on the Defendant's breath. According to Investigator Joy, the Defendant seemed to understand the officers when they read him his rights. The Defendant did not seem hesitant in giving his statement and, in fact, wanted to talk with Investigator Joy because the two of them went to school together. Investigator Joy informed the Defendant that they could talk but that the Miranda warnings still applied. Investigator Joy believed that, after the interview, the Defendant was placed in isolation. Defense counsel asked whether the Defendant was placed in "the drunk tank." Investigator Joy responded that he did not know but that it was customary to place individuals in isolation after an interview and sometimes the "drunk tank" was the only available place. He stated that he made no promises or threats to the Defendant to attempt to elicit information. The next day, the Defendant signed an identical waiver of rights. The Defendant told Investigator Joy, "I want to tell the truth about everything that happened," and the Defendant's statement was reduced to writing.

Special Agent Ronnie Faulkner with the Tennessee Bureau of Investigation ("T.B.I.") testified that on the evening of December 29, 2009, he encountered and interviewed the Defendant at the jail. In this meeting at the jail, the first thing Agent Faulkner did was read the Defendant his Miranda rights yet again. Agent Faulkner recalled the Defendant mentioning that he drank some vodka after shooting the two victims. However, in Agent Faulkner's opinion, the Defendant did not seem impaired during their discussions. To his knowledge, he was the first person to question the Defendant at the jail. He did not remember anything unusual about the Defendant's clothing, and he did not smell alcohol on

---

[1] We recognize the unusual spelling of Investigator Joy's first name. His first name appears with this spelling and with the spelling of "Steven" in different places in the record. It is our understanding that the spelling in the text is the correct spelling.

the Defendant's breath. Agent Faulkner could not recall asking the Defendant whether he could read or write or how far he advanced in school. However, he stated that the purpose of his reading the Miranda rights to the Defendant was in case the Defendant could not read the form on his own. He denied making any threats or promises to the Defendant. Agent Faulkner stated that, on December 30, he explained to the Defendant that the Defendant's story did not match up with information other witnesses had provided regarding the shooting. The Defendant then wanted to make another statement in order to rectify inconsistencies in his previous statement. Agent Faulkner read the Defendant his Miranda rights again on this second occasion.

The trial court found that Agent Faulkner properly gave the Defendant his Miranda rights on December 29 and 30. The trial court further determined that the Defendant's waiver of his Miranda rights was:

> voluntarily, knowingly and intelligently made. The Court finds that the rights were voluntary in the sense of free and deliberate choice rather than any intimidation, coercion or deception. Secondly, it appears that the waiver was made with full awareness, both of the nature of the right which was being abandoned by [the Defendant] and also the consequences of the decision to abandon that right. The totality of the circumstances surrounding the interrogation revealed that it was an uncoerced choice by [the Defendant] to make this statement and that there was the necessary level of comprehension for the Court to conclude that his Miranda rights were waived by him by signing these statements.

Based upon these findings, the trial court denied the Defendant's motion to suppress.

## B. Proof at Trial

At trial, Special Agent Faulkner of the T.B.I. testified that he was called to the scene of a double homicide on December 29, 2009. When he arrived, he observed that the Hardeman County Sheriff's Department had already secured the area and that there was a vehicle on the scene with two deceased males inside. The Sheriff's Department had identified the victims as Jason Sullivan and Jharmaine Jones ("victim Sullivan" and "victim Jones").[2] Agent Faulkner stated that two other T.B.I. agents were with him at the scene and that they stayed to continue investigating the scene while Agent Faulkner went to the Sheriff's Department. By the time he left the scene, the Sheriff's Department already had

_____

[2] Although victim Jones shares a common last name with the Defendant and some of the witnesses, there is no known blood relation between victim Jones and any of the other individuals identified in this case.

-4-

a suspect in custody, who turned out to be the Defendant. At the Sheriff's Department, Agent Faulkner spoke with a few investigators and took a statement from the Defendant.

Agent Faulkner testified that, in speaking with the Defendant, he advised the Defendant of his Miranda rights. The Defendant's statement began as a conversation in which they discussed what happened and he asked the Defendant some questions. After their discussion, the Defendant gave Agent Faulkner permission to write out the Defendant's statement. Once Agent Faulkner wrote out the statement, he reviewed the statement line by line with the Defendant, and the Defendant signed the statement, indicating the Defendant's adoption of the statement as his own. Agent Faulkner read the statement at trial which provided,

> Junior Spencer had an air tank stolen. I knew that [victim Sullivan] had the air tank. I called [victim Sullivan] tonight and asked him what he wanted for the air tank. [Victim Sullivan] said $30.00. [Victim Sullivan] came to my house to bring the air tank but I only had $5.00 then. I was going to get a $5.00 piece of dope, crack. [Victim Sullivan] took my $5.00 and hit me in the mouth. [Victim Sullivan] and [victim Jones] left. I went over to Junior's and he wanted me to call [victim Sullivan] to come back with his air tank. I called [victim Sullivan] to bring the air tank back. They came back, [victims Sullivan and Jones]. I got in the car with them and we went to Union Springs Church. We were in the old blue car. They had four guns in the car, a .22 rifle, a .12 or .20 gauge pump shotgun, a .25 and a .9 millimeter. I gave [victim Sullivan] the $30.00. [Victim Sullivan] said he was going- was taking that. I asked [victim Sullivan] to take me back home. [Victim Sullivan] jumped out and opened the door on me and was going to jerk me out. [Victim Sullivan] and I got into a scuffle and I ended up with the pistol. [Victim Sullivan] got back in the car to pull off. I pointed the pistol at the car. I short [sic] eight- seven or eight times at the car. I broke out running. I ran home. I told my daddy I had shot. I told him they were trying to get me. I killed them. I threw the pistol in a pond. I showed Billy Davis and Sheriff Hicks where I threw the pistol. When [victim Sullivan] was jerking me out of the car, he had the pistol in his hand. I have been buying crack from [victims Sullivan and Jones] for two or three years every day or so.

Agent Faulkner agreed that this first conversation lasted about 38 minutes. He acknowledged that it was possible that he could have missed something that the Defendant said in his statement. He also stated that he did not see any markings on the Defendant nor did he observe any behavior on the part of the Defendant that would be characteristic of someone getting beaten up. In describing the Defendant's demeanor on the night of the

shooting, Agent Faulkner said that the Defendant was excited. Agent Faulkner noted that he had to slow down the Defendant in order to understand what the Defendant was trying to tell him. However, he "wouldn't describe [the Defendant's demeanor] as bouncing off the walls in the first statement . . . . [The Defendant] sat down and talked to us and knew what he was doing."

The State asked Agent Faulkner whether he noticed the Defendant's clothes being muddy. Agent Faulkner stated that he did not remember anything out of the ordinary about the Defendant's clothes and that, had the Defendant's clothes been muddy, he likely would have noticed. He did not smell alcohol on the Defendant's breath or observe any type of behavior characteristic of being intoxicated or under the influence of drugs.

After Agent Faulkner took this statement, he continued his investigation by collecting evidence and taking statements from two witnesses. In taking those statements, he noticed differences between the witnesses' stories and the Defendant's story. Specifically, the two witnesses told Agent Faulkner that they were in the car with the Defendant when they drove to meet up with the two victims for a "drug deal." The day after the incident, Agent Faulkner obtained arrest warrants for the Defendant for two counts of first degree murder. When he served those warrants on the Defendant, Agent Faulkner informed him that his story was different from the accounts given by the two witnesses. The Defendant then requested to tell the police what happened. The Defendant signed another written Miranda waiver and adopted the written statement as he had the night before. The statement provided,

Last night less than an hour before the shooting of [victims Sullivan and Jones], I had called [victim Sullivan] to bring me some dope. They came to my house. I only had $5.00 and [victim Sullivan] got mad. He took my $5.00 and pushed me down and hit me. They left and I ran to my dad's and told him they took my money. I asked my dad for a gun. He said I needed to go on and sleep it off. I called [Jowan Murphy] -- I asked him if he had his pistol. I told him that [victims Sullivan and Jones] had took my money and I was going to get my money back and also get my $30.00 in dope, crack. I had $30.00 then. I had got $20.00 from my cousin and sold a can of baby milk to my neighbor for $5.00. Piearre and Rashad came and picked me up. I got Piearre's gun out of the console of his car. I called [victim Sullivan] and said to meet up at Union Springs Church to get $30.00 in dope. We got to the church first and then [victims Sullivan and Jones] pulled in behind us. I jumped out and ran toward their car. I yelled, "Man, give me my $5.00." They stopped. I started shooting at [victims Sullivan and Jones] in the car. They had tried to drive off when they saw the gun. I emptied the pistol at them. I jumped back in the car and we left back to New Castle. We stopped and I threw the pistol in a pond

beside Rashad's house.  Then I went to my dad's house and told him what I had done.

Agent Faulkner testified that this second statement given by the Defendant was consistent with the statements given by the two witnesses, and that the Defendant was much more calm than he had been the day before.  The Defendant never asked for a lawyer and never indicated that he could not read or write when he reviewed the waivers.

Defense counsel asked Agent Faulkner whether he interpreted the Defendant's statement that his father told him that he needed to go and "sleep it off" to mean that the Defendant might have been intoxicated.  Agent Faulkner answered, "I just took it that his dad knew that he was upset and he needed to sleep it off before he- the way I took it was that he needed to sleep it off before he did something he would regret."  Agent Faulkner stated that he did not follow up on the Defendant's statement that he got hit because there were no visible injuries and the Defendant did not indicate a need for medical treatment.

Agent Faulkner testified that he submitted nine spent shell casings to the T.B.I. crime lab for analysis.  The casings had been recovered from the parking lot by Special Agent Cathey Ferguson.  Four bullets had been recovered from the body of victim Sullivan, and three bullets were recovered from the body of victim Jones.  There was also a gunshot residue kit taken from the body of victim Jones.

Special Agent Ferguson testified that she was called to the crime scene on December 29, 2009.  By the time she got there the scene was mostly contained.  In her investigation of the crime scene, Agent Ferguson sketched the scene, inspected the car containing the two victims, marked and tagged evidence found at the scene, and measured some of the evidence obtained.  She stated that another agent photographed the scene, and she identified pictures depicting the scene as she saw it that night.

The State asked Agent Ferguson about her knowledge of guns.  Agent Ferguson stated that she is a firearms instructor for T.B.I. through which she trains agents and forensic scientists.  She is also an armorer[3] for Glock and the A-15 and 16 machine guns, and she used to be a handgun carry permit instructor for the State.  The State then asked Agent Ferguson what she interpreted it to mean that she found so many shell casings close together.

At this point, defense counsel objected, "She's not been qualified an expert to tell anything about what she sees about the casings found in the parking lot.  He's asking for an opinion."  The State responded, "I am asking for an opinion but this is an opinion that an

_____

[3] An armorer inspects, builds, and repairs firearms.

experienced lay person can give. She has testified that her experience with shooting and as an armer [sic] and the pattern of which those shell casings fell are something that someone with her level of experience as an avid non-expert could testify to." The trial court then asked if there was any further objection, stating, "She's not being offered as an expert witness." After a nonverbal indication from defense counsel, the trial court said, "No further objection. Okay." Agent Ferguson then proceeded to testify as follows:

> the person or persons that fired those rounds were standing relatively close to that area. When a shell casing is expelled from a gun they can fly quite some distance but generally if you see that many shell casings that close together, the shooter was probably standing in one area when they fired them.

She identified all the shell casings as .9 millimeter casings. On cross-examination, defense counsel asked, "being the expert, . . . if this is an automatic, semi-automatic, how long would it take to empty a gun with as many shell casings as you found out there? Somebody in an excited mood, how quickly could they do it?" Agent Ferguson responded that the amount of time would vary depending on a number of factors but that someone experienced at shooting could pull the trigger faster than one second per pull.

Agent Ferguson also noted that there were tire marks in the lot, indicating that the victims' car made circular, repetitive marks in the grass lot of the Union Springs Church. The car must have then traveled across the grass lot, over an embankment, across the road, and into a ditch where law enforcement officials found the vehicle. Agent Ferguson testified that the car was going in reverse as it made "doughnuts" in the lot, and that is why the car was facing the road from across the street.

Chief Deputy Billy Davis[4] testified that, on December 29, 2009, he was an investigator with the Hardeman County Sheriff's Department. He was called to the scene of a double homicide and later accompanied Sheriff Hicks in picking up the Defendant from the Defendant's father's residence. They conducted a brief interview of the Defendant in the Sheriff's vehicle before they left that residence. According to Chief Deputy Davis, the Defendant "began talking about what had occurred that night," so he gave the Defendant his Miranda rights. Because Chief Deputy Davis was not in his own vehicle, he told the Defendant his rights from memory, and he noted that the Defendant seemed to understand his rights. After waiving his rights, the Defendant stated that earlier in the evening he had a confrontation with the two victims of the shooting. Chief Deputy Davis could not recall whether the confrontation was over money or property, but the Defendant told him that the

---

[4] At the time of the crime, Chief Deputy Davis was an investigator, and he is the same person who testified at the suppression hearing as "Investigator Davis."

victims had assaulted him at his house earlier in the evening. As the evening progressed, the Defendant located the victims and shot them.

Chief Deputy Davis remembered that the Defendant appeared excited, but based on his thirteen years of experience, he did not think the Defendant was under the influence of alcohol or narcotics at the time of this interview. He did not smell any alcohol on the Defendant, and he did not remember the Defendant mentioning anything about his use of drugs that evening. Although the Defendant seemed excited throughout this process, he was compliant with the officers.

On cross-examination, Chief Deputy Davis recalled the Defendant mentioning that Chief Deputy Davis needed to speak with the Defendant's sister or relative regarding a fight that had taken place between the Defendant and the victims earlier in the night. Chief Deputy Davis also remembered speaking with some individuals at the scene of the shooting, but he did not put any of those statements in writing. He stated that he was more concerned with the double homicide than the fight that had occurred previously. Chief Deputy Davis accompanied the Sheriff and the Defendant to a pond in which the Defendant allegedly discarded the gun, but they were unsuccessful in recovering the weapon.

Jowan Piearre Murphy[5] testified that he spent some time with the Defendant around 12 p.m. on the day of the shooting. The two of them were drinking gin and beer from approximately 12 to 4 p.m., when they parted ways. Murphy described the Defendant's demeanor as "feeling pretty good" although not "throwing up drunk." The next time he saw the Defendant was around 8 or 9 p.m. at the Defendant's house. At some point, the two of them left with another individual named Rashad Woods because the Defendant asked Murphy to take him "to get a $30.00 piece of dope" from victim Sullivan. Murphy stated that he knew victim Sullivan from working in the nearby prison when victim Sullivan was an inmate. He acknowledged that the two of them became good friends. Murphy stated that the Defendant never discussed having a fight with someone earlier in the evening. According to Murphy, the Defendant called victim Sullivan first to obtain dope, but victim Sullivan said that "he was not messing with [the Defendant]" because he did not think that the Defendant had any money. However, the Defendant then called victim Jones, who said that he would bring the Defendant some "dope." By the time they drove to Union Springs Church to meet up with victim Jones, about twenty-five minutes by Murphy's estimation had passed since they left the Defendant's house.

_____

[5] Murphy testified that he and the Defendant are "double first cousins" and that they are both first cousins with Rashad Woods, who accompanied them to the parking lot of Union Springs Church.

When they pulled into the parking lot, the Defendant had not mentioned anything about Murphy's gun, but everyone knew that Murphy kept a gun in his console. Victims Jones and Sullivan drove into the lot in a car together and pulled their vehicle behind the rear of Murphy's car. Once the car pulled up behind them, the Defendant, without saying anything, took Murphy's pistol from the console, stepped out from the passenger seat of the vehicle, and began shooting at the victims' car. According to Murphy, when the Defendant began shooting, he said "something about an air tank and some $5.00, some dope." As the Defendant shot into the victims' car, the victims' car began backing away slowly. After the Defendant shot nine or ten bullets, the Defendant returned to the car. Murphy told the Defendant, "Hey, you shot them folks. You shot them. You done killed them." The Defendant responded, "Yeah, I killed them b***hes." As they left the parking lot, the victims' car was still going slowly in reverse.

Murphy stated that as they got back near their homes, the Defendant asked him to stop by a pond and threw Murphy's pistol into the pond, which was a .9 millimeter. Murphy later went to the police station to report what happened. Murphy stated that, although he had taken the Defendant to buy dope from these individuals in the past, he had no indication that the Defendant was going to murder victims Jones and Sullivan that evening.

On cross-examination, defense counsel asked Murphy why he no longer worked at the prison where he met victim Sullivan. Murphy responded that he was fired for allegedly sexually harassing an employee. When defense counsel followed up by asking if that employee was a male, the State objected as to relevance. In a bench conference, the following interaction took place:

> State: It's not relevant. He's still into character issues on an employment matter that has nothing to do with the incident involved and all he's trying to do is smear this witness in front of the jury.
>
> . . . .
>
> Defense counsel: It's relevant if [victim Sullivan] was his girlfriend or boyfriend. He gets terminated from his job for sexual harassment of other male employees, then what he's doing– if he coaxed [the Defendant] to go do something to [victim Sullivan], his ex-girlfriend, that's a motive right there.
>
> . . . .

State: He's trying to prove [Murphy's] conduct and compliance which is certainly not allowable here. We're not talking about convictions. He's trying to show prior conduct to show compliance in this matter.

. . . .

Defense counsel: It shows a motive for [Murphy] to lie about what happened that night. It shows his bias.

The trial court then sustained the objection, stating, "Based on your question, I don't find that answer would have been- is relevant to get to your point, so I'll sustain the objection." Defense counsel did not request an opportunity to make an offer of proof.

Robert Daniel Royse of the T.B.I. Crime Laboratory testified as an expert in ballistics. He explained that, somewhat analogous to the study of fingerprints, he studies the markings on bullets left by the particular gun from which the bullets were fired. Depending on the condition of the bullet after it is fired, he can determine whether bullets have been fired from the same make and model and even the specific gun barrel. In this case, Royse examined eight bullets, and he discovered that "all eight of these bullets had been fired through the barrel of the same firearm." He examined nine shell casings and determined that all of the casings were fired from the same gun. He further opined that, based on his examination, the bullets had "been fired through a .9 millimeter Luger, semi-automatic pistol."

Marco Ross, an expert in forensic pathology from the Medical Examiner's Office in Shelby County, testified that he examined the bodies of victims Jones and Sullivan. Pertaining to the body of victim Sullivan, Ross found several gunshot wounds. One bullet "entered the left side of the abdomen and it perforated the aorta and inferior vena cava." Ross also found gunshot wounds in victim Sullivan's back, left and right forearms, and left upper arm. However, he noted that some of the wounds could have been caused by the same bullet. According to Ross, the gunshot to the abdomen alone would have been sufficient to cause victim Sullivan's death. Judging from the placement of the gunshot wounds, Ross noted that victim Sullivan's death would not have been immediate. He approximated that it took anywhere from several minutes to fifteen or twenty minutes of bleeding for victim Sullivan to go into cardiac arrest and die. Ross's determination as to victim Sullivan's cause of death was multiple gunshot wounds.

Ross then discussed victim Jones's body. There were two gunshot wounds to the torso area. One wound indicated that the bullet entered the spine, and the other wound "went through a rib on the left side, then through the left lung, the esophagus, the aorta, the heart and the right lung, and that bullet ended up in his right anxilla or armpit area." Ross also

found gunshot wounds to the left forearm and left thigh. Ross's determination as to victim Jones's cause of death was also multiple gunshot wounds. Although a gunshot wound to the heart has the ability to cause immediate death, Ross explained that the amount of blood found in victim Jones's heart indicated that his death was not instantaneous. With respect to both bodies, the entrance wounds were on the left sides of the bodies, which would be consistent with shots entering through the driver's side of the vehicle.

Ross testified that, as part of the autopsy, he performed a toxicology analysis. In the body of victim Sullivan, the examination revealed the presence of marijuana and a breakdown product of cocaine. The toxicology report of victim Jones also indicated the presence of marijuana in the bloodstream. However, Ross opined that it was not the marijuana, or marijuana and cocaine in victim Sullivan's case, but the gunshot wounds that killed both victims.

Rashad Woods testified that, on the day of the shooting, he first saw the Defendant around 3 p.m. The Defendant was drunk at that time in Woods's estimation. The next time that Woods saw the Defendant was around 8:30 p.m. when Woods walked up toward the Defendant's driveway. The Defendant and Murphy were about to get in Murphy's car, so Woods asked them where they were going. Woods described the Defendant as still drunk, and the Defendant told Woods that he was about to go get thirty dollars worth of crack cocaine. According to Woods, Murphy had been drinking but was not too drunk to operate a car. However, in Woods's opinion, the Defendant was too impaired to operate a car. Woods told Murphy and the Defendant that he was coming along, and he got in the car. They did not discuss anything when they were on their way to meet victim Sullivan. Once they arrived in the parking lot and the victims drove in and stopped behind Murphy's car, the Defendant jumped out of the car. The Defendant pulled a gun out of his right pocket and an ammunition clip out of his left pocket. Woods remembered the Defendant say as he got out of the car, "I'm fitting [sic] to kill these mother f**kers," but Woods thought that the Defendant was "just drunk talking." Once the Defendant got out of the car, Woods heard yelling possibly coming from the victims and the Defendant, and he heard the Defendant say something about $5.00 and an air pump. Then Woods saw the Defendant fire the first gunshot, and at that point, Woods ducked down in the car until the firing ended. He heard six to eight gunshots in all.

Tynekki Jones, another first cousin of the Defendant, testified that she saw the Defendant a few times on the day of the shooting. She first saw the Defendant sometime around dinner time, and she "could tell that he had been drinking, but wasn't enough to be

-12-

drunk." The next time Tynekki[6] saw the Defendant, they were over at his house. She could tell that he was upset about something, and he told her that victim Sullivan "had pushed him in the mud and taken his money." She noticed mud on his shirt and pants, but she said that he did not "look roughed up." The Defendant was hysterical and crying, and he said, "I hadn't done nothing to nobody in a long time and they is [sic] not going to do me like this." She had never seen the Defendant cry before, and his crying indicated that he must have been very angry. Tynekki said that, at some point, the Defendant left. She was concerned that the Defendant was leaving for the purpose of killing the victims based on what she heard him say at the house. However, Tynekki did not really believe that the Defendant would follow through in killing the victims because "he's not that type of person. He's always been caring and I just wouldn't expect him to do nothing like that." The State asked Tynekki, "Did you think he was that angry?" and Tynekki conceded that he was. She acknowledged on cross-examination that, before the Defendant left to kill the victims, Murphy showed the Defendant his pistol, cocked it for the Defendant, and gave the pistol to the Defendant. After the Defendant came back from shooting the victims, he said, "I killed them. I killed them. They won't take nothing from nobody else."

On redirect examination, Tynekki acknowledged that, when she gave her statement to the police, she did not mention that the Defendant had been drinking that evening or that the Defendant had the interaction with Murphy regarding the gun. She agreed that these facts would have been relevant but asserted that the police did not ask her about any of these facts.

The State rested its case-in-chief, and defense counsel raised a motion for judgment of acquittal, arguing that the State failed to carry its burden in proving premeditated and intentional killings. Defense counsel also asserted that the State failed to properly establish jurisdiction. The Court denied the defense's motion, and defense counsel proceeded with the defense's case-in-chief.

Shanell Jones testified that, on the night of the shooting, he was at the Defendant's house when victim Sullivan came by for a few minutes. Shanell observed victim Sullivan talk to the Defendant, push the Defendant down, and then leave. He stated that, after victim Sullivan left, the Defendant appeared angry.

Tomeco Jones testified that she was also at the Defendant's house on the evening of the shooting. She said that the Defendant was "mad and crying and I knew somebody had did [sic] something to him and I knew he was high." She also stated that he had dirt on the back of his pants. Defense counsel asked Tomeco if she saw how Murphy and the Defendant

---

[6] Several of the witnesses share the same last name. Thus, for clarity, we will refer to these witnesses using their first names. We intend no disrespect.

interacted with each other. Tomeco responded, "[Murphy] told [the Defendant] that –" and the State raised a hearsay objection. Defense counsel responded, "Your honor, I think it's going to go under the inconsistent statement to impeach a witness." In a bench conference, defense counsel asserted that Tomeco's testimony would be inconsistent with Murphy's testimony that he never gave the Defendant his gun. The State countered that defense counsel's method was improper because defense counsel should have confronted Murphy with the statement that defense counsel was attempting to elicit through Tomeco. After back and forth between the State and defense counsel, defense counsel stated, "I'd just argue that you can get it in– that's fine." Tomeco then testified that the Defendant and Murphy were talking together and that Murphy looked "like he was cocking the gun." However, on cross-examination, she admitted that she never actually saw a gun.

The Defendant took the stand and testified that he woke up at about 9:30 or 10 a.m. on the day of the shooting and "smoked a blunt."[7] Then he went over to his cousin's house and drank from approximately 12:30 to 3:30 p.m. At some point, he went back home and called victim Sullivan about buying some "[c]rack, cocaine." When victim Sullivan came over to his house around 7:30 or 8:00 p.m.,

> I got a phone call about my girlfriend was on her way back so I wasn't going to spend the $30.00. I told him, I said, "Well, just let me get a little $5.00." You know, I was going to spend $5.00. I didn't want to be spooked and my girl was coming, right? So he got upset about the $5.00. I didn't have but $5.00, so he was going to try to give me a little piece of dope, so he gives me this little piece. I didn't want it, but I had my money and my phone and things in my hand and I didn't want the dope so I tossed his dope back in the car to him, right?
>
> . . . .
>
> Okay. You know, he gets upset about that. He jumps out of the car and snatched my money and my phone and everything. We do a little scuffling, and that's when [victim Jones], he gets out of the car while we into it, right? He gets out of the car and walks around and has a knife in his hand, so focus my attention on him coming around and that's when [victim Sullivan] hit me and pushed me down, you know what I'm saying, kick me over in a little side ditch, . . . and that's what happened there.

---

[7] A "blunt" is a slang term for a cigar filled with marijuana.

-14-

The Defendant stated that the victims drove off with his $5.00 and his cell phone. He was "[m]ad, crying, upset, everything," and he called Murphy to tell him what happened and ask for Murphy's pistol. However, he acknowledged that, before he called Murphy, he went to his father to ask for a gun, and his father told him, "Just go home and sleep it off."

The Defendant then met up with Murphy at the Defendant's house. Murphy put a clip and ten rounds in the gun, and then Murphy handed the gun to the Defendant. The Defendant placed the gun in his pocket. He testified, "I was still going to buy a piece of dope so I said, 'well I'm going to call and tell them,' you know what I'm saying– 'I want the $30.00'" because he "figured that was going to settle [him] down."

However, on cross-examination, the defendant stated that he only had $20.00 or $25.00 in his pocket. He acknowledged that he could not, therefore, buy $30.00 worth of cocaine from the victims. The Defendant called the victims, and they decided to meet at the Union Springs Church. Murphy drove the Defendant, and Woods also accompanied them to meet up with the victims. They arrived before the victims, and when the victims arrived, they pulled behind Murphy's car. The Defendant then got out of Murphy's car with the gun still in his pocket and began asking the victims about his money and phone. Victim Jones yelled about the Defendant not having any money and said that they should run over the Defendant. The Defendant claimed that this statement to run over the Defendant was the reason the car shifted into reverse, and at that point, the Defendant began shooting at the victims. However, on cross-examination, the Defendant admitted that, when the car began reversing, he stepped out of the way of the victims' car and was thus not in danger at the time he began shooting at the car.

He returned to Murphy's car after he finished shooting at the victims, and they drove back toward the Defendant's house. They stopped close to Woods's house so that the Defendant could throw the pistol into a pond at Murphy's urging. When they got back, the Defendant changed out of his clothes because they were muddy. Defense counsel asked him what his emotions were at this point, and the Defendant replied, "I was jittery and, you know, excited. I was upset still, you know."

The Defendant conceded on cross-examination that, in his first statement, he told law enforcement officials that he had been in a fight with victim Sullivan and that he took the gun away from victim Sullivan and shot him. He also acknowledged that, in his second statement to the police, he said that he obtained the pistol from the console of Murphy's car, stepped out of the car, and ran toward the victims with the gun. Additionally, he agreed that in his second statement he stated that the victims attempted to drive away when they saw the gun and that he "emptied the pistol at them." The Defendant admitted that nowhere in his

statements did he mention that the victims tried to run over him or that Murphy gave him the gun before leaving his house.

After deliberations, the jury convicted the Defendant of first degree premeditated murder as to victim Sullivan and the lesser included offense of voluntary manslaughter as to victim Jones. As a result of these convictions, the Defendant received an effective life sentence. On October 13, 2010, the Defendant filed a motion for new trial, and the Defendant later amended that motion. On February 4, 2011, the trial court denied the Defendant's motion, and the Defendant timely appealed his convictions.

On appeal, the Defendant argues that the trial court erred in (1) admitting his statements made to law enforcement officials, (2) sustaining the State's objection on a line of questioning by defense counsel regarding potential bias of the witness based upon alleged romantic interest, (3) excluding testimony of one witness purporting to impeach the testimony of another witness, and (4) allowing the testimony of a lay witness as to her knowledge regarding the use of firearms. The Defendant also argues that the jury lacked sufficient evidence to convict him of first degree premeditated murder as to victim Sullivan and voluntary manslaughter as to victim Jones.

## ANALYSIS

### I. The Defendant's Motion to Suppress

The Defendant argues that the trial court erred in denying the Defendant's motion to suppress the Defendant's statements made to law enforcement officials. The State responds that the trial court's denial of the Defendant's motion to suppress was proper.

### A. Standard of Review

In reviewing the trial court's determination on a defendant's motion to suppress hearing, "the findings of fact made by the trial court . . . are binding upon this court" unless the defendant establishes that "the evidence contained in the record preponderates otherwise." State v. Young, 196 S.W.3d 85, 127 (Tenn. 2006) (citations omitted). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). This Court shall afford the prevailing party "the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom." Young, 196 S.W. 3d at 127. However, we conduct a de novo review of the trial court's application of the law to the facts. Id.

## B. The Defendant's Statements to Law Enforcement Officials

The present issue involves the voluntariness of the Defendant's statements made to law enforcement officials, implicating the federal and state constitutional rights against forced self-incrimination. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). The Fifth Amendment to the United States Constitution, made applicable to the states through Malloy v. Hogan, 378 U.S. 1, 6 (1964), includes the following clause: "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. Similarly, article I, section nine of the Tennessee Constitution states that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself."

The United States Supreme Court held in Miranda v. Arizona, 384 U.S. 436, 444 (1966), that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444. Such procedural safeguards include the requirement that law enforcement officials advise a defendant in a custodial interrogation:

> that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

Id. at 479. See also State v. Bush, 942 S.W.2d 489, 499 (Tenn. 1997). However, a defendant may waive these rights if such a waiver "is made voluntarily, knowingly, and intelligently." State v. Blackstock, 19 S.W.3d 200, 207 (Tenn. 2000) (quoting Miranda, 384 U.S. at 444). Courts must look at the totality of the circumstances of the custodial interrogation to determine whether the waiver is knowingly, intelligently, and voluntarily made. See Bush, 942 S.W.2d at 500.

Although the Tennessee Supreme Court has interpreted the state protection under article I, section nine to grant essentially the same protection as the Fifth Amendment, State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997), "the test of voluntariness for confessions under Article I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." Walton, 41 S.W.3d at 82 (citation omitted). "[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence . . . .'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). Under Tennessee constitutional law, in order to consider the Defendant's

relinquishment of his rights to be voluntary, "the defendant must have personal awareness of both the nature of the right and the consequences of abandoning his rights." State v. Thacker, 164 S.W.3d 208, 249 (Tenn. 2005) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)).

Our Supreme Court has acknowledged that the mere consumption of alcohol prior to a defendant's confession does not render that confession involuntary. State v. Morris, 24 S.W.3d 788, 805-06 (Tenn. 2000). Rather, "[i]t is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." Id. at 805 (quoting State v. Robinson, 622 S.W.2d 62, 67 (Tenn. Crim. App. 1980)). In Morris, the Tennessee Supreme Court stated that the test to apply is "whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." Id. (citing State v. Beasley, No. 03C01-9509-CR-00268, 1996 WL 591203 (Tenn. Crim. App. Oct. 10, 1996)).

In the case before us, the Defendant asserts that none of the officers could recall his "physical appearance, whether he was under the influence of any drugs, [and] whether the Defendant had been drinking, even though they were in close proximity to the Defendant." Defense counsel asked all of the officers whether they remembered the Defendant's clothes being muddy. Agent Faulkner testified that he did not recall the Defendant having anything unusual on his clothing. We fail to see how the officers' memory as to this detail is critical to the voluntariness of the Defendant's statements. Thus, we do not consider the fact that the officers could not recall seeing mud on the Defendant's clothing as having any bearing on this issue. Additionally, Investigator Joy and Agent Faulkner testified that they did not smell alcohol on the Defendant's breath. Furthermore, Agent Faulkner stated that the Defendant did not seem impaired, even though the Defendant told Agent Faulkner that he drank some vodka after shooting the victims. Investigator Joy stated that the Defendant seemed readily willing to give a statement to him because the Defendant and Investigator Joy previously attended school together. He testified that he made no threats or promises to the Defendant in order to elicit information.

Moreover, all of the officers testified that they issued warnings to the Defendant as required under Miranda before taking his statement in each of the three instances. Although the officers did not remember asking the Defendant how far he went in school, Agent Faulkner explained at the suppression hearing that the purpose of reading a defendant his or her Miranda rights is in case the individual cannot read the rights on his or her own. After the officers informed the Defendant of his rights, he chose to waive those rights and provide the officers with a statement. In both instances in which the officers reduced the statement to writing, an officer read the statement to the Defendant, and the Defendant signed,

indicating that the statement was an accurate account of what he told the officers. The trial court held at the suppression hearing that the Defendant's rights were "voluntarily, knowingly, and intelligently" waived.

The Defendant has failed to demonstrate that he lacked sufficient comprehension of the situation or of his rights such that his waiver was not voluntarily, knowingly, or intelligently made. Furthermore, the Defendant has failed to establish that either his waiver or his statements were coerced by law enforcement officials. Therefore, we hold that the Defendant's waiver of his rights passes constitutional muster, and he is entitled to no relief on this issue.

## II. Evidentiary Issues

The Defendant also argues that the trial court erred in excluding defense counsel's line of questioning on cross-examination of witness Murphy concerning his purported bias based upon an alleged romantic interest in victim Sullivan, in excluding certain testimony by Tomeco Jones, and in admitting the testimony of Agent Ferguson.

### A. Standard of Review

We review issues regarding the admissibility of evidence under an abuse of discretion standard. State v. Looper, 118 S.W.3d 386, 422-23 (Tenn. Crim. App. 2003) (quoting State v. James, 81 S.W.3d 751, 760 (Tenn. 2002)). Thus, the trial court's decision will remain intact unless the reviewing court determines that the trial court abused its discretion. State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008). The only situations in which reviewing courts in Tennessee will find an abuse of discretion are "when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." Id. (citing Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)). See also Looper, 118 S.W.3d at 422.

### B. Defense Counsel's Cross-Examination of Murphy

The Defendant argues that the trial court erred in excluding defense counsel's line of questioning on cross-examination regarding allegations that Murphy had sexually harassed a male employee while employed at the prison. The Defendant asserts that the testimony should have been allowed to show Murphy's bias because of a previous relationship between Murphy and victim Sullivan. The State responds that the testimony that defense counsel attempted to elicit was not relevant. Specifically, the State contends that the testimony pertained to facts that were collateral to the ultimate issue in the case.

The right to question a witness as to potential bias is a recognized fundamental right. Delaware v. Van Arsdall, 475 U.S. 673, 680 (1986); State v. Sayles, 49 S.W.3d 275, 279 (Tenn. 2001). "Although the trial court retains discretion regarding the exercise of the right to examine witnesses for bias, any undue restriction on that right may violate a defendant's right to confrontation under the Sixth Amendment of the United States Constitution and Article 1, Section 9 of the Tennessee Constitution." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (citations omitted). To prevail, the Defendant must establish that "he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witnesses." Van Arsdall, 475 U.S. at 680. See also Rice, 184 S.W.3d at 670.

Defense counsel sought to elicit testimony on cross-examination that Murphy, while working at the prison, was accused of sexual harassment of a male employee. However, the State objected as to relevance. In a bench conference, defense counsel stated, "It's relevant if [victim Sullivan] was his girlfriend or boyfriend. He gets terminated from his job for sexual harassment of other male employees, then what he's doing– if he coaxed [the Defendant] to go do something to [victim Sullivan], his ex-girlfriend, that's a motive right there." Defense counsel followed up by stating, "It shows motive for [Murphy] to lie about what happened [the night of the shooting]. It shows his bias." The trial court sustained the objection, noting that the particular question and corresponding answer were not relevant in furthering the defense's point. Defense counsel did not proffer Murphy's testimony for the record.

The Tennessee Rules of Evidence provide that:

Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of a party is affected; and
> (2) . . . the substance of the evidence and the specific evidentiary
> basis supporting admission were made known to the court by
> offer or were apparent from the context.

Tenn. R. Evid. 1.03(a). Put another way, "[u]nless an offer of proof is made, this Court is without sufficient information to determine whether exclusion of the evidence was reversible error," particularly "when the excluded evidence consists of oral testimony." Atkinson v. State, 337 S.W.3d 199, 209 (Tenn. Ct. App. 2010) (citing State v. Goad, 707 S.W.2d 846, 853 (Tenn. 1986)).

While not entirely clear from the record, it appears that defense counsel was attempting to show Murphy's bias by eliciting that he was fired for alleged sexual harassment

of a male employee. We note that the Defendant is entitled to confront witnesses regarding the potential bias of those witnesses. However, such testimony must still be relevant. Tennessee Rules of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

To the extent defense counsel was attempting to establish that Murphy had a romantic relationship with victim Sullivan, not even the insinuation of such evidence or testimony ever came into the record. Moreover, the alleged sexual harassment that defense counsel sought to elicit pertained not to victim Sullivan but an unnamed third party. Thus, we conclude that the trial court did not abuse its discretion in finding that such testimony was not relevant.

Finally, even if the trial court erred on this issue, clearly it would constitute harmless error in this case. Because errors regarding the admissibility of evidence typically do not violate constitutional rights, the harmlessness of such errors is assessed under the guidelines provided in Tennessee Rule of Appellate Procedure 36(b). State v. Rodriguez, 254 S.W.3d 361, 371-72 (Tenn. 2008). Under Tennessee law, the defendant bears the burden of demonstrating that such an error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); Rodriguez, 254 S.W.3d at 372. In evaluating the impact of the error, appellate courts must assess the record of the trial court in its entirety, taking into consideration all properly admitted evidence pointing toward the defendant's guilt. Rodriguez, 254 S.W.3d at 372. Thus, "[t]he greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." Id. (citing State v. Toliver, 117 S.W.3d 216, 231 (Tenn. 2003); State v. Francis, 669 S.W.2d 85, 91 (Tenn. 1984)).

Here, even if defense counsel should have been permitted to introduce evidence of Murphy's bias from an alleged relationship with victim Sullivan, it is extremely unlikely that such evidence would affect the outcome of the trial. At the most, it would have discredited Murphy's entire testimony, but the jury still would have had before it the Defendant's own statements about killing the two victims, the testimony from Woods about the incident, and the testimony of several other witnesses regarding the Defendant's actions prior to and after the shooting. While we hold that the trial court's determination was proper, we also hold that even if the trial court erred, such an error would be harmless. Accordingly, the Defendant is not entitled to relief on this basis.

## C. Tomeco Jones's Testimony

The Defendant asserts that the trial court erred in excluding an out-of-court statement that defense counsel attempted to elicit through the witness, Tomeco Jones, that purportedly would impeach Murphy's testimony. The Defendant argues that this testimony would have been used at trial to impeach the testimony of Murphy.

Tomeco Jones testified that she was present at the Defendant's home before he left to meet up with the victims on the night of the shooting. Defense counsel asked Tomeco what she observed as far as the Defendant's interaction with Murphy. When Tomeco stated, "[Murphy] told [the Defendant] that –," the State raised a hearsay objection. Defense counsel responded, "Your honor, I think it's going to go under the inconsistent statement to impeach a witness." In a bench conference, defense counsel asserted that Tomeco's testimony would be inconsistent to Murphy's testimony that he never gave the Defendant his gun. The State countered that defense counsel's method was improper because defense counsel should have confronted Murphy with the statement that defense counsel was attempting to elicit through Tomeco.

Based on the record before us, we do not know the substance of the testimony that Tomeco would have given. In the absence of an offer of proof in the record, this Court will not reverse the trial court's evidentiary ruling. See Atkinson, 337 S.W.3d at 209.

Furthermore, Tennessee Rule of Evidence 613(b) provides, "Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless and until the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require." Here, during defense counsel's cross-examination of Murphy, defense counsel asked Murphy if he gave the Defendant his gun or showed the Defendant how to use it. Defense counsel never questioned Murphy regarding the purported testimony of Tomeco Jones about Murphy's alleged statement, thus never giving Murphy the chance to explain or deny such a statement. Thus, the Defendant failed to satisfy the requirement of Rule 613(b) regarding extrinsic evidence of a prior inconsistent statement. Moreover, Tynekki had already testified that she observed Murphy cock the pistol and hand it to the Defendant, so the testimony that defense counsel sought to elicit from Tomeco was already before the jury through a different witness. Thus, if there was an error in excluding the statement, any error would be harmless. Therefore, the Defendant is entitled to no relief on this issue.

## D. Agent Ferguson's Testimony

The Defendant argues that the trial court erred in allowing Agent Ferguson's testimony regarding her knowledge of firearms because she testified as a lay witness but gave expert testimony. The State responds that Agent Ferguson's testimony was not expert testimony and, in the alternative, that Agent Ferguson was qualified as an expert in firearms even though the State did not request her recognition as an expert at trial.

Rule 701(a) of the Tennessee Rules of Evidence governs opinion testimony of lay witnesses. It states,

> If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are
> (1) rationally based on the perception of the witness and
> (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

Tenn. R. Evid. 701(a). However, Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Essentially, "[t]he distinction between an expert and non-expert witness is that a non-expert witness's testimony results from a process of reasoning familiar in everyday life and an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." State v. Brown, 836 S.W.2d 530, 549 (Tenn. 1992) (citing Phillips v. Tidwell, 174 S.W.2d 472, 477 (1943)).

Agent Ferguson testified that she is a firearms instructor for T.B.I. which includes quarterly training for agents and forensic scientists. She stated that she is an armorer for Glock and the A-15 and 16 machine guns. After Agent Ferguson listed her experience with guns, the State asked Agent Ferguson what she would infer from seeing so many shell casings close together. Defense counsel objected, arguing that the State had not qualified Agent Ferguson as an expert and yet was seeking an opinion. The State responded that Agent Ferguson was testifying as an experienced lay person. When the trial court then asked defense counsel if there was any further objection, defense counsel gave a nonverbal indication that led the trial court to say, "No further objection. Okay." Tennessee Rule of Evidence 103(a) provides, "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." However, Tennessee Rule of Appellate Procedure 36(a) states, "Nothing in this rule shall be construed as requiring relief be granted

to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of the error." Here, while defense counsel initially objected to Agent Ferguson's testimony, he apparently recanted the objection such that the trial court never ruled upon whether Agent Ferguson's testimony was expert testimony. Consequently, the Defendant has not properly preserved this issue for appellate review.

Moreover, even if the trial court erred in admitting Agent Ferguson's testimony regarding the location of the shell casings at the scene, any error would be harmless. Over the course of the trial, the jury also heard the testimony of Royse, an expert in ballistics, who testified that, based on his examination of the bullets found at the scene, all of the bullets as well as the casings were fired from the same firearm. Additionally, the jury heard testimony from Murphy and the Defendant himself indicating that the Defendant fired the gun multiple times before returning to the car. Finally, the jury heard the testimony of Chief Deputy Davis and Investigator Joy regarding the Defendant's own confessions. Therefore, any error on this issue clearly constitutes harmless error. Accordingly, the Defendant is not entitled to relief on this issue.

### III. Sufficiency of the Evidence

### A. Standard of Review

The Defendant also contends that the State's evidence was insufficient to support his convictions for the first degree premeditated murder of victim Sullivan and the voluntary manslaughter of victim Jones. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts

based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

## B. First Degree Premeditated Murder of Victim Sullivan

First degree premeditated murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2007). The existence of premeditation is a factual determination to be made by the jury in light of all the surrounding circumstances. State v. Schmeiderer, 319 S.W.3d 607, 635 (Tenn. 2010); see also State v. Vaughn, 279 S.W.3d 584, 594-95 (Tenn. Crim. App. 2008). Premeditation is defined by statute as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (Supp. 2007).

Because premeditation requires insight into the defendant's state of mind, a jury may infer the defendant's intent based on his or her actions and the surrounding facts and circumstances of the killing. State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005); see also Young, 196 S.W.3d at 108; Vaughn, 279 S.W.3d at 594-95. Thus, "[a]lthough a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." Jackson, 173 S.W.3d at 408 (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)).

Our Supreme Court has identified a number of relevant circumstances that may indicate premeditation, including: "the use of a deadly weapon upon an unarmed victim; . . . declarations by the defendant of an intent to kill; evidence of procurement of a weapon," Bland, 958 S.W.2d at 660; and "failure to provide aid or assistance to the victim." State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008) (citations omitted). Additionally, the jury may

also take into consideration "the shooting of a victim after [the victim] had turned to retreat or escape." State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

The Defendant contends that the evidence is not sufficient to support his first degree premeditated murder conviction. We disagree. Although the Defendant's statements are inconsistent with each other, Agent Faulkner testified that the Defendant's second written statement was consistent with the statements given by Murphy and Woods to law enforcement officials. In this second statement, the Defendant indicated that victim Sullivan came to the Defendant's house to bring him "some dope" but that the Defendant only had $5.00, so victim Sullivan pushed and hit the Defendant. Tynekki Jones testified that the Defendant was hysterical and crying from his encounter with victim Sullivan. Although she did not think that the Defendant was the kind of person that would kill the victims, she agreed that the Defendant was angry enough from his interaction with victim Sullivan to commit such an act.

The Defendant stated that, after his incident with victim Sullivan, he asked his father and then Murphy for a gun so that the Defendant could retrieve his money and the "dope" that he wanted from victim Sullivan. Tynekki also stated that, before the shooting, she observed Murphy cock his pistol and give it to the Defendant. Thus, there was evidence of procurement of a weapon.

Additionally, the Defendant stated that he met up with the victims in the Union Springs Church parking lot and that he pulled Murphy's gun from the console of the car. He said that he jumped out of the car and yelled at the victims and that, when the victims tried to drive away at the sight of the gun, the Defendant "emptied the pistol at them." The Defendant's statement is indicative of shooting victim Sullivan after he had already turned to retreat or escape.

Murphy also testified that, when the victims arrived in the church parking lot, the Defendant retrieved Murphy's gun from the console of his car, exited the vehicle, yelled at the victims, and began shooting at their car. He further stated that, as the Defendant fired the shots, the victims' car began backing away slowly. According to Murphy, after the Defendant fired nine or ten shots, the Defendant returned to the car and stated that he "killed them b***hes." Woods testified that, when the victims arrived at the church parking lot, the Defendant jumped out of the car and said, "I'm fitting [sic] to kill these mother f**kers." Woods stated that he heard yelling and then gunshots, at which point he ducked down until firing ceased. From Woods's testimony, a jury could have found that the Defendant made a declaration of an intent to kill the victims. Finally, according to Murphy, Woods, and the Defendant, as soon as the Defendant finished shooting the victims, Murphy, Woods, and the Defendant left the scene, indicative of a failure to provide assistance or aid to the victims.

Ross testified as an expert in forensic pathology that the cause of victim Sullivan's death was multiple gunshot wounds. Although victim Sullivan had marijuana and cocaine in his system, Ross determined that it was not the presence of those drugs but the wounds that killed victim Sullivan.

Viewing these facts with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, the jury had ample evidence to find the existence of an intentional and premeditated killing sufficient to support a first degree premeditated murder conviction.

## C. Voluntary Manslaughter of Victim Jones

Voluntary manslaughter is defined as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211 (2006). One acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2006). One acts knowingly "when the person is aware that his or her conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). Circumstances rising to a level of "adequate provocation" is a question for the jury to decide. See State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995).

We hold that sufficient evidence exists for a jury to convict the Defendant of voluntary manslaughter as to victim Jones. In the case before us, there is conflicting testimony given by various witnesses surrounding the circumstances leading up to and during the shooting. In the Defendant's second statement to law enforcement officials, he states that he called victim Sullivan to meet him at the church but that in actuality both victim Sullivan and victim Jones showed up. However, Murphy testified that victim Sullivan had said he "was not messing with [the Defendant]," so the Defendant called victim Jones to bring him some "dope." The Defendant testified that, when the victims drove into the church parking lot, victim Jones yelled at victim Sullivan to run over the Defendant. The Defendant stated that he then jumped out of the way and began shooting at the victims' vehicle. However, Woods testified that, when the Defendant got out of the car to walk toward the victims' vehicle, the Defendant said, "I'm fitting [sic] to kill these mother f**kers." Tynekki testified that the Defendant was angry only about the actions of victim Sullivan.

Based on the evidence provided at trial, it was possible for the jury, as the trier of fact, to determine that the Defendant intentionally killed victim Jones "in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." See Tenn. Code Ann. § 39-13-211. Therefore, we conclude that there also was sufficient evidence to support the Defendant's conviction for the voluntary manslaughter of victim Jones.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's convictions for first degree murder and voluntary manslaughter.

_____

JEFFREY S. BIVINS, JUDGE